**STATE of Utah, Plaintiff and Appellee,**

v.

**Billy Joe PRICE, Defendant and Appellant.**

No. 930605–CA.

Court of Appeals of Utah.

Dec. 14, 1995.

Ronald W. Perkins, Ogden, for Appellant.

Thomas B. Brunker and Jan Graham, Salt Lake City, for Appellee.

Before DAVIS, BENCH and BILLINGS, JJ.

## OPINION

DAVIS, Associate Presiding Judge:

Defendant Billy Joe Price appeals his conviction for murder, a first degree felony, pursuant to Utah Code Ann. § 76–5–203 (1995).[1] We affirm.

## I. FACTS

We recite the facts in a light most favorable to the jury's verdict. *State v. Hancock*, 874 P.2d 132, 133 (Utah App.), *cert. denied*, 883 P.2d 1359 (Utah 1994).

Katherine Scott was the estranged girlfriend of defendant. The two had lived together in Salt Lake City for approximately two years and had a child together (Char'ee). However, their relationship ended when Scott moved to Ogden about two months before her murder.

At approximately 9:00 p.m. on January 4, 1992, defendant and Scott talked on the telephone without incident. Later that evening, Scott dropped Char'ee off at Scott's grandmother's house (Jesse Anderson) and went to a movie with Tony Hairston. Anderson received a phone call from defendant who, upon learning that she had Char'ee, asked if he could come pick her up.[2] Anderson refused. Defendant then told Anderson to have Scott call him when she returned.

After Scott picked up Char'ee, defendant called again. When he found out that Anderson had forgotten to tell her to return defendant's phone call, defendant went searching for Scott. Realizing that defendant sounded angry on the phone, Anderson called Scott to tell her that defendant was on his way to her apartment, but did not reach her.

After pulling up in front of her apartment, Scott went inside, leaving Hairston and Char'ee in the car. At this time, defendant pulled up behind Scott's car and walked past it, making eye contact with Hairston. When Scott emerged from her apartment, defendant began yelling at her. Hairston turned down the radio and partially rolled down his window so that he could hear the conversation between the two. Scott asked defendant what he was "tripping off of" and, at that point, defendant pulled out his gun and shot Scott in the head. After Scott fell to the ground, defendant, aiming both times for her head, shot Scott twice more. Scott died at the scene.

After shooting Scott, defendant returned to his vehicle and drove to a gas station where he called 911. Defendant told the 911 dispatcher that he had just shot his girlfriend. The dispatcher kept defendant on the line until Officer Norman Hall arrived. Defendant, who was crying and visibly shaken, again told Officer Hall that he shot Scott. Defendant was placed under arrest by Officer Michael Cox, who then took defendant to the police station. While waiting for a detective to arrive, Officer Cox remained with defendant. At no point did Officer Cox question defendant regarding the shooting. When Detective Randy Lythgoe arrived, Officer Cox, defendant, and Detective Lythgoe went into Detective Lythgoe's office. After Detective Lythgoe uncuffed defendant's hands from behind his back and recuffed him to the chair so that he would be more comfortable, Detective Lythgoe informed defendant who he was, what he was there to do, and turned on a tape recorder. Defendant was then advised of his Miranda rights. Defendant verbally responded that he understood his rights and did not need an attorney present. Detective Lythgoe testified that at this time defendant was under control, was not crying, and did not appear to be under the influence of any controlled substance.

Part way through the interview, Detective Lythgoe asked defendant if he had any questions. Defendant responded that "I realize I done something bad here, you know, but I don't want to get railroaded." Detective

---

1. Defendant does not appeal from his conviction of possession of a dangerous weapon by a restricted person, a third degree felony, pursuant to Utah Code Ann. § 76–10–503 (1995).

2. Defendant was supposed to have kept Char'ee the previous night, but was unable to do so because he got off work late. In his typewritten statement given to police, defendant stated that he had not planned on seeing Char'ee Saturday evening, the night of the shooting.

Lythgoe reminded defendant that he had been advised of his rights and asked defendant, "Is there any doubt in your mind that you know what your rights are?" Defendant replied, "Yeah. I'm giving up a whole lot of them." Detective Lythgoe again admonished defendant that he did not have to talk to the officers and that "you're doing this all of your own free will and choice. You know that you can have an attorney present during questioning." Nonetheless, at no time during the interview with Detective Lythgoe did defendant state that he wanted to remain silent or have an attorney present.

After the conclusion of the taped interview, defendant gave a typed statement. Defendant sat next to Detective Marci Vaughn, who typed defendant's statement. Defendant could see the computer screen and the text being entered. At the top of the computer screen was a typed version of the Miranda warning. Not only was defendant given the opportunity to read this statement, but Detective Lythgoe also read it to him. Once the typed statement was completed, defendant reviewed it and made the necessary corrections.

Defendant was charged with aggravated murder, a capital offense, pursuant to Utah Code Ann. § 76–5–202 (1995), and possession of a dangerous weapon by a restricted person, a third degree felony, pursuant to Utah Code Ann. § 76–10–503(3) (1995). Although defendant was initially represented by private counsel, Martin Gravis of the Public Defender Association of Weber County, Inc.[3] (Public Defenders) was subsequently appointed to represent him. Stephen Laker, also with Public Defenders, was involved at this time as co-counsel to Gravis, but only for the penalty phase of the trial. Defendant subsequently fired Gravis due to differences of opinion regarding the way the case should proceed.[4]

On August 3, 1992, defendant was brought before the trial court to discuss appointing a new attorney. Defendant requested that John Caine represent him. Caine was also under contract with the Public Defenders. Prior to his appointment, Caine stated that he had a relationship with the victim's family, both as a friend and as a legal representative. Notwithstanding, Caine informed the court that he did not feel this relationship would inhibit his ability to act as a zealous advocate for defendant. Defendant, aware of Caine's position, not only consented to but requested that Caine be appointed as his attorney. Several months later, however, and only days before the trial was to begin, Caine became aware of certain statements given by defendant to a psychiatrist who was evaluating defendant. Defendant apparently voiced concern that Caine was not actively representing his interests and that his involvement with Scott's family was most likely interfering with his ability to adequately represent defendant. As a result, Caine felt it best that he withdraw as counsel.[5] During a discussion with the court, although defendant briefly mentioned Caine's relationship with Scott's family, his primary concern was the amicable relationship between Caine and the prosecutor. Without stating the underlying grounds for doing so, the trial court allowed Caine to withdraw as defendant's counsel and again attempted to appoint defendant an attorney.

When discussing with the court the possibility of appointing another public defender, defendant claimed that he did not want to be represented by a public defender because they shared too close of a relationship with the prosecutor's office. However, the trial court admonished defendant that the public defenders were there to ensure that he received a fair trial and that they were "not in

---

3. Public defender services are provided under the terms of the "Agreement for Indigent Criminal Legal Services" between Weber County and the Public Defender Association, a corporate entity. This agreement provides that the Association "shall contract with at least three law firms and/or individual practitioners not associated in fact." The parties do not dispute this fact.

4. Although defendant states that a "conflict" arose between defendant and Gravis, the record suggests disagreement over trial strategy, rather than a conflict of interest within the meaning of the Rules of Professional Conduct.

5. At no time, however, did Caine express to the court that his prior involvement with the Scott family would hinder his ability to effectively represent defendant.

anybody's pocket."[6] Attorneys Stephen Laker and Robert Froerer, who were also under contract with the Public Defenders office, were ultimately appointed to represent defendant, and did so at his trial.

The jury convicted defendant of murder, a first degree felony, pursuant to Utah Code Ann. § 76–5–203 (1995). Defendant pled guilty to the possession of a firearm charge. Defendant appeals only the murder conviction.

## II. ISSUES

Defendant raises numerous issues on appeal: (1) whether the trial court erred in denying defendant's motion to suppress his confession; (2) whether the trial court erred in denying defendant a change of venue; (3) whether the trial court erred in denying defendant's motion for a mistrial; (4) whether sufficient evidence existed to support defendant's murder conviction; (5) whether a conflict existed which prevented defendant's trial attorneys from representing him; and (6) whether defendant was denied the effective assistance of counsel.

## III. ANALYSIS

### A. Voluntariness of Confession

■ Defendant claims that the trial court erred in denying his motion to suppress his confession on the grounds that it was not voluntary. "[T]he ultimate determination of whether a confession is voluntary is a legal question, and we review the trial court's ruling for correctness." *State v. Mabe*, 864 P.2d 890, 892 (Utah 1993). Notwithstanding, we grant the trial court "a measure of discretion ... because of the variability of the factual settings." *State v. Pena*, 869 P.2d 932, 941 (Utah 1994). If a trial court has made factual findings regarding the voluntariness of the confession, we will not disturb them except for clear error. *Mabe*, 864 P.2d at 892.

*Mabe* provides us with the necessary analysis for determining whether a confession was voluntary: "The constitutional standard for determining the voluntariness of a confession requires that we independently review the entire record. From this review, we must conclude, based on the totality of circumstances, ... [whether defendant] rendered his confession voluntarily." *Id.*

■ In the case at bar, the totality of the circumstances supports the conclusion that defendant's confession was entirely voluntary. Detective Lythgoe observed that, at the time of the interview, defendant was in control of his faculties and did not seem to be under the influence of drugs. Detective Lythgoe also testified that "[e]verything [defendant] did, ... all of his expressions, everything, convinced me that he knew exactly what he was doing." When defendant voiced concern to Detective Lythgoe that he did not want to be "railroaded" into making a confession, Detective Lythgoe stopped the interview, reminded defendant that he had been advised of his rights, and told him he did not have to talk to the officers if he chose not to. However, defendant continued with the interview, going so far as to prepare a written confession to which he made changes. On this basis, the trial court found that defendant was repeatedly informed of his rights and that "[Detective] Lythgoe actually went overboard in explaining far beyond what his responsibilities would have been to explain." The trial court also found that defendant consistently stated that he "really did understand" his rights and knew that he was waiving them.

Additionally, defendant has made no allegation that he was coerced into confessing, *see Mabe*, 864 P.2d at 892–94; *State v. Strain*, 779 P.2d 221, 226–27 (Utah 1989), but challenges the voluntariness of his confession solely on the fact that he was crying and upset because he had just shot his girlfriend once in the head and twice more as she was lying on the ground.[7] We find defendant's

---

6. Gravis, who was present in the courtroom during this colloquy, stated to the court that defendant had told him that he would continue to fire the public defenders until Ron Yengich was appointed to represent defendant.

7. Defendant cites *State v. Ashdown*, 5 Utah 2d 59, 296 P.2d 726, 729 (Utah 1956), aff'd, 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958), in support of his argument that " 'crying,' 'moaning,' and 'sobbing' " are evidence of an involuntary confession. While *Ashdown* did state that

argument to be unpersuasive, if not absurd, and hold that the trial court was correct in concluding that defendant's confession was voluntary and appropriately denied his motion to suppress.

## B.   Change of Venue

Defendant moved for a change of venue on the ground that he would be denied a fair trial because the victim was black and, therefore, because Weber County has a black population of only 2446 residents, "it [would be] practically impossible to have this group represented on the jury panel in Weber County because the vast majority of this group either were related to or knew the decedent or her family." Thus, in order "to seat a fair cross section [jury] panel[,]" defendant argues that a change of venue "to a county where black jurors could more likely be seated" was necessary. The trial court denied defendant's motion. Defendant claims that the trial court abused its discretion by doing so, contending that the absence of blacks on his jury panel is a violation of his rights under the Sixth Amendment to the United States Constitution and Article I, Section 12 of the Utah Constitution. We disagree.

■  It is within the trial court's discretion to grant or deny a motion for a change of venue and we will not disturb its decision absent an abuse of that discretion. *State v. Cayer,* 814 P.2d 604, 608 (Utah App.1991).

■  While defendant is correct in stating that he has a constitutional right to a jury selected from a fair cross-section of the community, this does not grant him the right to have blacks on the jury panel. *See Taylor v. Louisiana,* 419 U.S. 522, 528, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975); *Redd v. Negley,* 785 P.2d 1098, 1100 (Utah 1989). "Defendants are not entitled to a jury of any particular composition." *Taylor,* 419 U.S. at 538, 95 S.Ct. at 702. Therefore, defendant's "objection cannot be viewed as anything more

than an objection that there was not a proportionate number of [blacks] ... on the jury panel which would try his case. This is not a legally sufficient objection." *Redd,* 785 P.2d at 1100. " 'The mere observation that a particular group is underrepresented on a particular panel does not support a constitutional challenge.' " *Id.* (quoting *United States v. Grose,* 525 F.2d 1115, 1119 (7th Cir.1975), *cert. denied,* 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976)).

Further, there is nothing in the record supporting defendant's assertion that of the 2446 black residents of Weber County, the majority were related to or knew the victim or her family. Although one prospective black juror was drawn from the jury pool and excused because she was acquainted with the victim, this is hardly supportive of defendant's assertion that all of the black residents of Weber County knew Scott or her family. Accordingly, the trial court did not abuse its discretion in denying defendant's motion for a change of venue.

## C.   Mistrial

In addition to the murder charge, defendant was also charged with possession of a firearm by a restricted person pursuant to Utah Code Ann. § 76–10–503 (1995). The parties agreed not to refer to that charge during defendant's murder trial because of its potential prejudicial effect. During voir dire of prospective jurors, however, a calendar referring to this charge was inadvertently posted on the fourth floor of the courthouse. When defendant became aware of this, he called it to the court's attention and moved for a mistrial. The trial court denied defendant's motion, concluding that because the calendar simply read "CA–Aggravated Murder, F3–Possession of a Dangerous Weapon," a reasonable person would not relate that to the charge of possession of a firearm by a restricted person. Furthermore, the prospective jurors were already

---

"the intelligence, character, and situation of the accused at the time of the confession is an important consideration" for determining whether a confession was voluntary, the court concluded that "[t]his, alone ... will not render a confession inadmissible and if the confession was obtained in a manner and by such methods as are

consistent with the proper detection of crime and determination of guilt, then our duty is to sustain the trial court." *Id.* Moreover, defendant has not pointed to any particular intellectual or character traits which would have affected his ability to give a voluntary confession. Thus, defendant's reliance on *Ashdown* is misplaced.

aware that defendant had shot the victim with a firearm. Therefore, the court determined that the posted calendar was not prejudicial.

■ A trial court has discretion to grant or deny a motion for a mistrial and its decision will remain undisturbed absent an abuse of that discretion. *Rasmussen v. Sharapata,* 895 P.2d 391, 394 (Utah App.1995). A defendant has the burden of persuading this court that the conduct complained of prejudiced the outcome of the trial. *State v. Boone,* 820 P.2d 930, 932 (Utah App.1991).

■ After reviewing the record, we conclude that the trial court did not abuse its discretion by denying defendant's motion for a mistrial. Defendant has failed to present any evidence that any of the prospective jurors saw the calendar or, more importantly, that any jurors sitting on the panel saw the calendar. Thus, he has failed to present us with even minimal evidence that the outcome of the trial was prejudiced by the posted calendar.

In addition, defendant invited the potential error of which he now complains. When the parties and the court became aware of the posted calendar, the court suggested that they question the remaining prospective jurors to see if they had seen the calendar without making a specific reference to the charge at issue. If a prospective juror had seen the calendar, the court suggested that they could conduct further voir dire in chambers. However, defense counsel objected to the court's suggestion. This court has stated that " '[a] party who leads a court into error cannot later complain of that error to obtain reversal.' " *Clark v. Farmers Ins. Exch.,* 893 P.2d 598, 600 n. 4 (Utah App.1995) (citation omitted); *accord State v. Gordon,* 886 P.2d 112, 117 (Utah App.1994). Thus, we affirm the trial court's denial of defendant's motion for a mistrial not only because defendant has failed to show prejudice, but also because defendant declined to avoid any error that might have occurred because of the posted calendar.

### D. Insufficient Evidence

Defendant argues that there was insufficient evidence to convict him of murder [8] because the evidence only supported a verdict of manslaughter.[9] In support of his argument, defendant claims that "the evidence showed that [he] caused the death of ... Scott while under the influence of extreme emotional disturbance for which there is a reasonable explanation." [10]

■ When a jury verdict is challenged on the ground that the evidence is insufficient, we " 'review the evidence and all inferences which may be reasonably drawn from it in the light most favorable to the verdict of the jury.' " *State v. Alvarez,* 872 P.2d 450, 459 (Utah 1994) (quoting *State v. Hamilton,* 827 P.2d 232, 236 (Utah 1992)). "We will not reverse a conviction unless 'the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted.' " *Id.* (quoting *Hamilton,* 827 P.2d at 236).

■ Given the evidence, there is no question that a jury could find beyond a reasonable doubt that defendant was guilty of murder. In his statement to the police after the

---

8. In pertinent part, the murder statute provides:

  (1) Criminal homicide constitutes murder if the actor:
    (a) intentionally or knowingly causes the death of another;
    (b) intending to cause serious bodily injury to another commits an act clearly dangerous to human life that causes the death of another;
    (c) acting under circumstances evidencing a depraved indifference to human life engages in conduct which creates a grave risk of death to another and thereby causes the death of another....

  Utah Code Ann. § 76–5–203 (1995).

9. The manslaughter statute provides, in relevant part, that:

  (1) Criminal homicide constitutes manslaughter if the actor:
    ....
    (b) causes the death of another under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse....

  Utah Code Ann. § 76–5–205(1)(b) (1995).

10. Defendant does not dispute the fact that he murdered Scott, only the intent necessary to convict him of first degree murder.

shooting, defendant said that in the previous six months his relationship with Scott was "alright." Defendant and Scott had spoken on the phone at approximately 9:00 p.m. that evening and the two were joking around during their conversation. Even so, defendant took a loaded gun with him as he left Salt Lake City for Ogden. While defendant denied being angry with Scott, he nevertheless pulled out the gun because Scott "just ran off at the mouth," frustrated him, and hurt his feelings. Defendant admitted shooting Scott several times, aiming each time for her head because he was "tired of her hurting me." As he was shooting her, defendant asked Scott "How [do you] ... feel now[?]" Defendant was not intoxicated at this time and had had no alcohol since the previous night when he had consumed one beer.

While talking to the 911 operator after the shooting, defendant was calm and in control. The first police officer to reach defendant testified that although defendant was understandably agitated and nervous, he was making sense, responding appropriately to questions, and was in control. Lastly, Detective Lythgoe testified that when he met defendant at the police station, defendant was not under the influence of any controlled substance, was under control, and understood what he had done.

The above evidence clearly supports a verdict under any definition of first degree murder. Although defendant claims that the evidence supports only a manslaughter conviction because he was "under the influence of extreme emotional disturbance for which there is a reasonable explanation or excuse[,]" Utah Code Ann. § 76–5–205(1)(b) (1995), the record is devoid of any evidence supporting defendant's contention, showing only that he was "frustrated" with Scott for "hurting his feelings." Defendant is remiss in his assertion that frustration and hurt feelings reach the level of extreme emotional disturbance. Accordingly, we hold that the evidence was not " 'sufficiently inconclusive or inherently improbable' " to create a reasonable doubt as to defendant's guilt of first degree murder and we therefore affirm the jury's verdict. *See Alvarez*, 872 P.2d at 459 (citation omitted).

### E. Conflict of Interest

Defendant next asserts that his trial counsel, Mr. Froerer and Mr. Laker, had an imputed conflict of interest which prevented them from representing him. Defendant premises his claim on the allegation that his prior counsel, initially Mr. Gravis and then Mr. Caine, had established conflicts of interest. Therefore, because Mr. Gravis, Mr. Caine, Mr. Froerer, and Mr. Laker all were under contract with the Public Defender's office which defendant alleges constitutes a firm, the conflict between defendant, Mr. Gravis, and Mr. Caine was imputed to Mr. Froerer and Mr. Laker.

Rule 1.10(a) of the Rules of Professional Conduct provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so." The Comment to Rule 1.10 provides that

> [w]hether two or more lawyers constitute a firm ... can depend on the specific facts.... [I]f they present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules. The terms of any formal agreement between associated lawyers are relevant in determining whether they are a firm....

Thus, to prevail on his claim, defendant must establish that the attorneys were all part of the same firm. Even if we presume that Mr. Gravis and/or Mr. Caine had a conflict of interest which prevented them from representing defendant, defendant has failed to establish that the four attorneys presented themselves as a firm to the public or conducted their affairs to suggest that they were part of the same firm. Defendant simply makes a bald assertion that the four belong to the same firm without providing any factual basis supporting his claim or an adequate legal argument with supporting authority. Under these circumstances, this court has shown no reluctance to refuse to address the raised issue. *See Wisden v. Bangerter*, 893 P.2d 1057, 1058 n. 2 (Utah 1995); *D.D.Z. v. Molerway Freight Lines,*

*Inc.*, 880 P.2d 1, 3 (Utah App.1994); *Christensen v. Munns*, 812 P.2d 69, 72 (Utah App.1991). Accordingly, we decline to reach the conflict of interest issue set forth by defendant.[11]

### F. Ineffective Assistance of Counsel

Lastly, defendant claims that he was denied the effective assistance of counsel because Mr. Froerer and Mr. Laker failed to hire an investigator to inquire into the defendant's relationship with Scott and her family. "When, as in this case, the claim of ineffective assistance of counsel is raised for the first time on appeal, we resolve the issue as a matter of law." *State v. Strain*, 885 P.2d 810, 814 (Utah App.1994).

The analytical framework for determining whether a defendant was denied the effective assistance of counsel was set forth in the landmark case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The complaining defendant must first show that counsel's performance "fell below an objective standard of reasonableness." [12] *Id.* at 688, 104 S.Ct. at 2064. To do so is a heavy burden and a defendant must overcome " 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *Strain*, 885 P.2d at 814 (citations omitted).

■ The defendant must also show that counsel's performance was prejudicial by proffering sufficient evidence demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. If it is easier to dispose of the issue on this second prong, then a court may do so without

reaching the first *Strickland* prong. *Id.* at 697, 104 S.Ct. at 2069.

Defendant argues that further investigation would have disclosed witnesses who could have testified as to defendant's mental state. Defendant asserts that he was angry and frustrated with his relationship with Scott and claims that there was hostility between defendant and Scott's family members. Thus, defendant hypothesizes that this evidence would have supported a conviction of manslaughter, as opposed to first degree murder, because it would have shown that he was suffering from extreme emotional disturbance, a necessary element in proving manslaughter. Notwithstanding defendant's contentions, his argument fails on both prongs of the *Strickland* test.

■ With respect to the first prong of the test, we note that defendant's complaint is not that his attorneys did not sufficiently investigate defendant's relationship with Scott and her family, but only that they failed to hire an investigator to explore the alleged tumultuous relationship. Indeed, although it has been held that an inadequate investigation is a basis for demonstrating ineffective assistance of counsel, *see State v. Templin*, 805 P.2d 182, 188 (Utah 1990), this does not suggest that a defendant is entitled to a hired investigator. To the contrary, this court has held that a defendant is entitled to a hired investigator only when (1) the defendant has exhausted other means of investigation and (2) it is necessary for a complete defense. *State v. Hancock*, 874 P.2d 132, 135 (Utah App.), *cert. denied*, 883 P.2d 1359 (Utah 1994); *accord* Utah Code Ann. § 77–32–1(3) (1995). Because defendant has failed to allege that an exhaustive investigation was not completed by his attorneys, we presume they fulfilled that duty. Accordingly, defen-

---

11. Not only does defendant fail to provide sufficient legal analysis, supporting authority, or evidence supporting his claim that the attorneys were part of the same firm, but the record does not support his allegation. The language of the Public Defender contract suggests the contrary by providing that "[t]o help alleviate the [conflict of interest] problems, the ASSOCIATION shall contract with at least three law firms and/or individual practitioners *not associated in fact.*" (Emphasis added.) In addition, when the court was determining who should be appointed to represent defendant when Mr. Caine withdrew as

his counsel, he recognized that he could not appoint Bernard Allen because he was Mr. Caine's partner. Thus, by appointing Mr. Laker and Mr. Froerer, the court implicitly determined that they were not part of the same firm as Mr. Caine or Mr. Gravis.

12. A defendant must point to specific instances of counsel's conduct which amounted to ineffective assistance of counsel. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066.

dant has not shown that his counsels' performance "fell below an objective standard of reasonableness" and has therefore failed the first prong of the *Strickland* standard. *See Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064.

Defendant has also failed to meet the prejudice prong of the *Strickland* test. The Utah Supreme Court has previously addressed a failure to investigate claim in *Parsons v. Barnes,* 871 P.2d 516, 523–24 (Utah), *cert. denied,* —— U.S. ——, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994). *Parsons* held that a defendant "cannot meet the prejudice prong of the *Strickland* test simply by identifying unexplored avenues of investigation. Rather, he must demonstrate a reasonable probability that further investigation would have yielded sufficient information to alter the outcome of his [trial]." *Id.* Aside from defendant's self-serving statement that he suffered from extreme emotional disturbance because of Scott and her family, defendant has not demonstrated that additional investigation would have revealed any information which would have better supported a manslaughter conviction.[13] Accordingly, defendant has not met the prejudice prong of the *Strickland* test.

For the above reasons, defendant's ineffective assistance of counsel claim fails.

## IV. CONCLUSION

We hold that defendant's confession was voluntary and, therefore, the trial court did not err by denying defendant's motion to suppress. Because defendant did not raise a legally sufficient challenge to the trial venue, the trial court's denial of defendant's motion for a change of venue is affirmed. With respect to defendant's motion for a mistrial, not only did defendant fail to show any prejudice from the posted calendar, he declined to ameliorate the situation, thereby inviting the error, if any, of which he now complains. Accordingly, the trial court was correct in denying defendant's motion for a mistrial. We further hold that sufficient evidence existed to support the jury's verdict of first degree murder and that the evidence also dictated against a manslaughter conviction. Because defendant's brief lacked sufficient legal analysis regarding whether attorneys Gravis, Caine, Froerer, and Laker belonged to the same firm, we decline to address defendant's conflict of interest issue. Lastly, not only has defendant failed to allege that his attorneys did not sufficiently investigate the relationship between defendant, Scott, and Scott's family, but he has also failed to show that any further investigation would have yielded information that would have changed the outcome of his trial. Therefore, defendant's claim of ineffective assistance of counsel fails.

We affirm defendant's conviction of first degree murder in all respects.

BILLINGS, J., concur.

BENCH, Judge, concurring in the result:

The main opinion clearly reaches the right result. I write separately to clarify potentially misleading dicta contained in the main opinion.

For the proposition that we decide whether a confession was admissible, the main opinion follows the analysis of *State v. Mabe,* 864 P.2d 890 (Utah 1993). The *Mabe* standard was necessarily modified by *State v. Pena,* 869 P.2d 932 (Utah 1994). For questions of mixed fact and law, we are now to give the trial court "some degree of deference." *Id.* at 938. "There are currently just two exceptions to this general rule: voluntariness of consent and . . . ineffectiveness of counsel." *State v. Perry,* 899 P.2d 1232, 1245 (Utah App.1995) (Bench, J., concurring).

The main opinion also purports to definitively decide whether defendant was denied effective assistance of counsel, an issue that was raised for the first time on appeal. The supreme court has expressly held that we can review ineffective counsel claims raised for the first time on appeal only in "the unusual situation," under "peculiar, narrow circumstances." *State v. Humphries,* 818 P.2d 1027, 1029 (Utah 1991); *accord State v.*

---

**13.** The record, in fact, suggests the contrary. Ebony Ross, Scott's cousin, testified that she witnessed defendant physically abuse Scott, at one time kicking her in the stomach "Ninja style" when she was pregnant with Char'ee, and then hitting her.

*Garrett,* 849 P.2d 578, 580 (Utah App.), *cert. denied,* 860 P.2d 943 (Utah 1993). This is not such a case.

For the foregoing reasons, I concur only in the result.