**2019 UT App 85**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSEPH MICHAEL SIMPSON,
Appellant.

Opinion
No. 20160835-CA
Filed May 16, 2019

Fourth District Court, Heber Department
The Honorable Lynn W. Davis
No. 131500240

Colleen K. Coebergh, Attorney for Appellant

Sean D. Reyes and Aaron Murphy, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES GREGORY K. ORME and DAVID N. MORTENSEN
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     Joseph Michael Simpson was convicted of aggravated murder and sentenced to life in prison without the possibility of parole. He appeals his conviction alleging that he received constitutionally ineffective assistance of counsel because his trial counsel failed to move to suppress Simpson's police interviews, which were arguably taken in violation of the Fifth Amendment to the United States Constitution, and because his trial counsel failed to present any evidence in mitigation at sentencing. We affirm.

BACKGROUND[1]

¶2    Early in the morning on December 16, 1995, two farmers discovered a body on the banks of the Provo River. The body was that of a seventeen-year-old female (Victim). Victim's body was naked and bloodied, with a large hole in the back of her skull. Several bloodied rocks were found around Victim's body. A deputy with the Wasatch County Sheriff's Office was among the first members of law enforcement to arrive at the crime scene.

¶3    The doctor who performed Victim's autopsy testified that the cause of death was "craniocerebral injuries" or "blunt force injuries" to the head. The doctor collected fingernail clippings, various fluids from Victim's body, blood swabs, and vaginal swabs. The doctor also photographed what appeared to be a bloody fingerprint on Victim's wrist.

¶4    An image of Victim's tattoo was released to the media, and Victim was identified by an individual alleging to be Victim's boyfriend. This individual revealed that Victim had recently relocated from out of state and was a sex worker, and that this individual also acted as Victim's "pimp." Police eventually excluded this individual as a suspect. Police identified sixteen possible suspects, but each one was eventually excluded. After extensive investigation, the case went cold.

¶5    In 2008, more than ten years later, advancements in DNA testing allowed the Wasatch County Sheriff's Office to reexamine cold cases. The bloodied rocks found at the crime

---

1. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (quotation simplified).

scene were sent to a private forensics laboratory for testing. DNA from at least two males was identified—a major DNA profile and a minor DNA profile. Victim's vaginal swabs were sent to the State Crime Laboratory for DNA testing. This testing identified major and minor DNA profiles for two different males with the minor profile being insufficient for comparison. Further testing of the major profile resulted in a complete DNA profile from the semen on the vaginal swab that matched the major DNA profile found on the rocks. The DNA was run through a national database and matched a known profile for Joseph Michael Simpson. An investigation uncovered that Simpson, a Florida resident, was living in Utah at the time of the murder. It was also discovered that Simpson had previously been convicted of murder and was on parole for that crime at the time Victim was killed. Two officers from Wasatch County traveled to Florida, observed Simpson smoking a cigarette outside of his place of employment, and retrieved the cigarette butt for testing. The test revealed that the DNA on Simpson's cigarette matched Simpson's DNA on record.

¶6 The next month, the two officers interviewed Simpson twice in Florida, video recording both interviews. The first video shows that the officers advised Simpson of his *Miranda* rights, but the record is silent as to whether the officers Mirandized Simpson at the outset of the second interview. During the course of the interviews, the police learned that at the time of Victim's murder, Simpson was employed with an airport shuttle service and that he would deliver customers to Park City, Midway, and Sundance, Utah. Simpson admitted that when he lived in Utah, he would engage sex workers once or twice a week and that he would use the company shuttle to pick up those workers. And while he was adamant that he did not recognize Victim, he stated that it was possible that he could have picked Victim up as a sex worker. When asked how his DNA ended up on the rocks that were likely used to murder Victim, Simpson claimed he had no idea and could not explain it. Simpson then said, "I'm

going to stop talking because I don't know what's going on here." The officers continued questioning Simpson, and again he stated, "I want to stop talking because I have no idea what's going on . . . . I want to stop talking right now." The officers persisted in their questioning and then later asked Simpson if he had any questions, to which Simpson responded, "I'm not asking anybody. I said this is stopping now because I don't know what's going on." Simpson was later arrested and charged with aggravated murder. A subsequent cheek swab of Simpson confirmed that Simpson's DNA matched the DNA found in Victim's vagina and on the bloodied rocks.

¶7     At trial, the jury heard testimony from three DNA experts. These experts testified about how DNA is collected from crime scenes and how the samples were processed in this case. The expert testimony included an explanation of how the results of the vaginal swabs revealed DNA from two males—a major and minor profile. The major profile matched Simpson, and the minor profile was insufficient for comparison. Twenty-one nanograms of DNA that matched Simpson's profile were found on a rock near Victim's body. Accordingly to the experts, the chances that another individual has the same profile as Simpson, who is Caucasian, are "one in 4.6 million for Caucasians, one in 58.2 million for African Americans, and one in 30.2 million for Hispanics."

¶8     To counter the State's DNA expert testimony, Simpson's counsel argued a DNA transfer theory: it could have been Simpson's DNA found in Victim's vagina, but Simpson's DNA was transferred from Victim's vagina to the rocks by the person who actually murdered Victim. Simpson's expert witness explained that "it would be possible for someone to put their fingers into the vaginal vault of the victim and then touch the rocks at the scene of the crime, thus depositing Mr. Simpson's DNA onto the rocks, even if he had not been present at the scene." Alternatively, it was "hypothesized that the unknown

male contributor of DNA inside the victim's vagina could have inserted his penis into the victim's vagina, having Mr. Simpson's DNA transferred to his penis, and then if he touched his penis and then the rocks, transfer both of their DNA to the rocks." Simpson's expert did acknowledge that with each transfer of DNA, it would be expected that a progressively smaller amount would be transmitted with each subsequent transfer. The expert testified that finding twenty-one nanograms of DNA on the rock "is much higher than [one] would expect to see from a secondary transfer." When asked if the DNA transfer theory was possible in this case, the expert responded, "Yes, it's possible." When asked if it was likely, the expert stated, "I wouldn't say likely, but it is possible."

¶9    Also at trial, two jailhouse informants testified that Simpson admitted to each of them that he committed the murder. The first informant testified that Simpson said, "I got away with it this long. What would make them open the case now? Why now after all this time?" The first informant also testified that Simpson took a ring "from [Victim] and gave it to his girlfriend or his wife." The second informant testified that Simpson "would always complain about [the] finding [of] his DNA on a rock by [Victim]" and that Simpson told him that he never confessed to the first informant. In response, the second informant asked Simpson, "Why don't you be quiet about it? You did it anyways, didn't you?" Simpson replied, "Yeah, but I didn't tell [the first informant]. He must have been looking through my paperwork when I wasn't in my cell."

¶10    The jury found Simpson guilty of murder. The jury was then charged with determining whether Simpson committed aggravated murder, and was presented with a single witness who testified to and authenticated Simpson's prior judgment and commitment for murder. At this point, the jury learned only the fact of Simpson's prior murder conviction, not its details. The jury returned a verdict of aggravated murder.

¶11 At the sentencing phase of trial, the jury was charged with determining whether Simpson should serve life with or without the possibility of parole. In making this decision, the jury was instructed to consider the following factors: (1) the nature and circumstances of the crime; (2) Simpson's character, background, history, and mental and physical condition; (3) Victim and the impact of the crime on Victim's family and community; and (4) any other facts in aggravation or mitigation. The jury was informed that in order for something "[t]o be considered mitigating, a circumstance or factor need not justify or excuse the crime, but merely reduce the defendant's moral culpability or blameworthiness." The jury was also instructed to consider mitigating factors that may relate to the crime itself or Simpson's background or personal circumstances.

¶12 After speaking with his counsel about whether he might testify or exercise his right of allocution, Simpson elected to make a statement in allocution.[2] Both Simpson's counsel and the State waived opening statements and elected to move straight to the evidentiary stage of the proceeding. The State presented evidence of Simpson's 1982 juvenile conviction for lewdness, for which he was diagnosed and treated for a sexual dysfunction. For the first time, the jury heard the details of Simpson's prior murder conviction. The State told the jury that a woman Simpson was dating expressed intentions of dating another man, and Simpson went to that man's home and stabbed him several times in the hip, hands, arms, shoulders, neck, head, and back. Simpson left the knife in the man's back and the victim died

---

2. Black's Law Dictionary defines "allocution" as "[a]n unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence." *Allocution*, Black's Law Dictionary (10th ed. 2014).

shortly after emergency workers arrived. The jury also heard evidence that Simpson had been convicted of driving under the influence and possession of drug paraphernalia. Additionally, the State presented evidence that while Simpson was incarcerated in the Wasatch County Jail, he got into a fight and was charged with assault on a prisoner.

¶13    Simpson's counsel waived the right to present any argument in mitigation. During its closing argument, the State reiterated much of the evidence the jury had previously heard and how it related to the jury instructions. Simpson's counsel discussed some of the jury instructions, argued that individuals change as they age and that sentencing is not only about retribution and deterrence, but also about society's interest in rehabilitating criminals. Simpson then gave his statement in allocution to the jury with the goal of seeking sympathy, leniency, and mercy. Simpson spoke about his family and the sports he played in high school, and he noted that he "had a great childhood." He then told the jury that he moved to Florida to escape a bad situation involving an ex-girlfriend who was involved in drugs. While living in Florida, Simpson explained that he obtained a Commercial Driver's License, adopted a pet, and remained trouble-free for fifteen years. He also told the jury about his health problems, including diabetes and high blood pressure. Simpson concluded by saying, "I do wish you guys would hopefully give me another chance, and that's life with parole." By a decision of eleven out of twelve jurors, the jury determined that Simpson should be sentenced to life in prison without the possibility of parole. Simpson appeals.

ISSUES AND STANDARDS OF REVIEW

¶14    Simpson raises two claims of ineffective assistance of counsel on appeal. He claims his counsel was ineffective in (1) failing to move to suppress his statements to law enforcement, and (2) failing to present any evidence in

mitigation at sentencing.[3] "A claim of ineffective assistance of counsel raised for the first time on appeal presents a question of law . . . ." *State v. Mohamud*, 2017 UT 23, ¶ 10, 395 P.3d 133 (quotation simplified).

## ANALYSIS

## I

¶15 The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

---

3. The State notes that part of Simpson's mitigation argument is a stand-alone claim that the Eighth Amendment to the United States Constitution requires a court to "engage in a colloquy" in a non-capital proceeding like this one to ensure that a defendant "knowingly and intelligently waiv[ed] the right to have mitigation evidence put on in his defense." This issue is unpreserved and is therefore reviewed for plain error. *See State v. Irwin*, 924 P.2d 5, 7 (Utah Ct. App. 1996). "Utah courts have repeatedly held that a trial court's error is not plain where there is no settled appellate law to guide the trial court." *State v. Ross*, 951 P.2d 236, 239 (Utah Ct. App. 1997). There is no settled law from either the United States Supreme Court or a Utah appellate court that requires a trial court to engage in a colloquy with a non-capital defendant to determine whether that defendant knowingly and intelligently waives the right to allocute in mitigation at sentencing. Simpson acknowledges that a decision in his favor on this issue would require this court to recognize a new Eighth Amendment right. Therefore, we are not persuaded that the trial court committed plain error when it did not undertake a colloquy similar to that required for a death-sentence defendant, and we therefore decline to further address this issue. *See Irwin*, 924 P.2d at 7.

defence." U.S. Const. amend. VI. This amendment "ensure[s] that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland v. Washington*, 466 U.S. 668, 691–92 (1984). "[T]he right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). Therefore, a defendant who does not receive effective assistance of counsel has a Sixth Amendment claim. *See id.* at 771.

¶16 In order to succeed on a claim of ineffective assistance of counsel, an appellant must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance was prejudicial. *Strickland*, 466 U.S. at 687; *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. If an appellant fails to prove either element, the claim necessarily fails. *See Strickland*, 466 U.S. at 687. As it can be "all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable," "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. As a result, "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

¶17 To establish the deficient performance prong, Simpson must show that "counsel's conduct 'fell below an objective standard of reasonableness' under prevailing professional norms." *Lafferty v. State*, 2007 UT 73, ¶ 12, 175 P.3d 530 (quoting *Strickland*, 466 U.S. at 688). In so doing, Simpson must "rebut the strong presumption that under the circumstances, the challenged action might be considered sound trial strategy." *State v. Bond*, 2015 UT 88, ¶ 62, 361 P.3d 104 (quotation simplified). We afford attorneys "wide latitude" in developing a defense strategy because "even the best criminal defense attorneys would not defend a particular client in the same way." *State v. Hull*, 2017 UT App 233, ¶ 17, 414 P.3d 526 (quotation simplified). However, counsel's strategy must be "reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. To prove deficient

performance, Simpson must persuade this court that "there was no conceivable tactical basis for counsel's actions." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified). "We will conclude that counsel's performance was deficient only if it can be said that no objectively competent attorney would have adopted the complained-of strategy." *Hull*, 2017 UT App 233, ¶ 17.

¶18   In this case, Simpson argues that his trial counsel was ineffective for not seeking to suppress his two separate video-recorded statements made to law enforcement. As evidenced by the first recorded interview, Simpson indicated five separate times that he did not want to speak to the officers. The officers continued to question him in spite of his declarations. The officers also brought Simpson back in for questioning a second time. Simpson argues that, by his statements that he did not want to speak during the two interviews, he "unequivocally invoked his Fifth Amendment right not to speak to [the] officers." Therefore, any statements he made after he had declined to speak "were the product of a violation of his right against compelled self-incrimination."

¶19   The two interviews provided the police officers with information that Simpson patronized sex workers; that he was employed with a shuttle service and he used the shuttle to pick up those sex workers; that he knew the route to Midway, Utah, including the area where Victim's body was found; and that he was familiar with the area where Victim was last seen. Simpson argues that this "information, combined with the State's evidence that the victim was a sex worker, essentially told the State's whole case." He further asserts that these statements, allegedly taken in violation of the Fifth Amendment, "took the skeleton of the State's case, and gave it flesh, organs, and skin." And Simpson concludes that for counsel not to move to suppress the statements he made in the videos "constitutes deficient

performance" and "cannot be viewed in any other way than prejudicial."

¶20   In this appeal, we are not reviewing the denial of a motion to suppress; rather, we are reviewing whether counsel was justified in not filing a suppression motion. While a claim of ineffective assistance of counsel "necessarily requires the court to look at the substantive issue the defendant argues his counsel should have raised, and whether the substantive issue had any merit, the substantive issue is only viewed through the lens of counsel's performance." *State v. Johnson*, 2017 UT 76, ¶ 22, 416 P.3d 443. "The mere allegation of ineffective assistance is not enough alone to revive the substantive claim." *Archuleta v. Galetka*, 2011 UT 73, ¶ 32, 267 P.3d 232.

¶21   The United States Supreme Court has held that "the failure to file a suppression motion does not constitute per se ineffective assistance of counsel." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). This is because there can be strategic reasons for counsel not to file such a motion. *See id.* at 385. But a lack of strategy, or an unreasonable strategy, can demonstrate counsel's deficient performance if that performance is "contrary to prevailing professional norms." *Id.* Therefore, we must determine whether Simpson's trial counsel may have had reasonable strategic considerations for not moving to suppress the statements he made to law enforcement.

¶22   A decision from an Illinois appellate court is particularly instructive on whether there can be reasonable strategic considerations for not moving to suppress a defendant's video-recorded statements to law enforcement. In *People v. Jones*, 862 N.E.2d 1159 (Ill. App. Ct. 2007), a defendant appealed his first degree murder conviction contending that "his counsel was ineffective for failing to file a motion to suppress a videotaped confession in which defendant invoked his right to remain silent." *Id.* at 1161. The defendant argued "his videotaped

statement was inadmissible because the assistant state's attorney failed to honor his invocation of his right to remain silent and continued to question him after the invocation." *Id.* at 1163. The court agreed that the defendant invoked his right to silence, but since the court was "not reviewing the denial of a motion to suppress," the issue was "whether defense counsel was ineffective for failing to file the motion." *Id.* The court determined that there was "a valid strategic reason to allow the State to introduce the videotaped statement." *Id.* At trial, the defense counsel's closing argument used "details contained in defendant's videotaped confession." *Id.* Additionally, the court stated, "[a]bsent the introduction of the videotape, counsel would have had virtually no evidence to argue [the defendant's defense]." *Id.* Ultimately, the court held that the defendant did "not overcome the strong presumption that his counsel's failure to file a motion to suppress was the result of trial strategy." *Id.*

¶23   In this case, the State argues that "Simpson has not . . . overcome the presumption that it was sound trial strategy to let the jury hear his police interviews." We agree. As the State notes, "[t]he decision to rely on the police interviews formed a core part of the entire defense strategy." At trial, Simpson's counsel did not seriously challenge that the DNA found on Victim and found on the likely murder weapon belonged to Simpson. Instead, counsel argued a DNA transfer theory. Since two different male DNA profiles were found inside Victim's vagina and on the likely murder weapon, Simpson offered expert testimony explaining that "it would be possible for someone to put their fingers into the vaginal vault of the victim and then touch the rocks at the scene of the crime, thus depositing Mr. Simpson's DNA onto the rocks, even if he had not been present at the scene." Alternatively, it was "hypothesized that the unknown male contributor of DNA inside the victim's vagina could have inserted his penis into the victim's vagina, having Mr. Simpson's DNA transferred to his penis, and then if he touched his penis and then the rocks, transfer both of their DNA

to the rocks." This theory was dependent on Simpson's statements that he had engaged sex workers while living in Utah and may have had sex with Victim. Because Simpson did not testify at trial, this defense theory could be presented to the jury only through the introduction of Simpson's statements. As the State argues, "without evidence that Simpson frequented [sex workers] when he lived in Utah in 1995, [defense] counsel would have had no basis beyond rank speculation to argue the transfer DNA theory."

¶24 Additionally, several other strategic reasons exist for counsel's decision not to seek suppression of Simpson's statements. In the videos, Simpson denied several times that he murdered Victim. In closing argument, trial counsel referred the jury to the videos to evaluate Simpson's credibility. Counsel told the jury, "You saw [Simpson]'s statement when the officers went to Florida and interviewed him. Do you remember his demeanor, what he was like?" Counsel otherwise would not have been able to introduce Simpson's denial to the jury, with the jury also being unable to evaluate his demeanor, except by putting Simpson on the stand. If Simpson were to have testified at trial, the prosecution could have cross-examined Simpson about his solicitation of sex workers, his employment with the shuttle service, and his knowledge of the area where Victim was found; he also risked the State using his prior murder conviction for impeachment purposes.

¶25 Without Simpson's statements to the police, the facts before the jury were that a young woman was found murdered. DNA from two males was found present in Victim's vagina and on the rocks that were likely used to murder her. There was a greater amount of Simpson's DNA on both the murder weapon and in Victim's vagina. There were also two separate jailhouse informants who testified that Simpson confessed to the murder. Given these circumstances, counsel's strategy to use Simpson's statements to police at trial, rather than seek to suppress them,

was reasonable. We cannot say that "no objectively competent attorney would have adopted" this strategy. *State v. Hull*, 2017 UT App 233, ¶ 17, 414 P.3d 526. Whenever there "is a legitimate exercise of professional judgment in the choice of trial strategy, the fact that it did not produce the expected result does not constitute ineffectiveness of counsel." *Parsons v. Barnes*, 871 P.2d 516, 524 (Utah 1994) (quotation simplified). We conclude that Simpson's counsel did not perform deficiently in not seeking to suppress Simpson's statements to police and therefore Simpson did not receive ineffective assistance of counsel.

II

¶26 Simpson also contends that his trial counsel was constitutionally ineffective for failing to present the jury with any evidence that would mitigate his culpability at sentencing. In order to succeed on a claim of ineffective assistance of counsel, an appellant must show that: (1) counsel's performance was deficient; and (2) counsel's deficient performance was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92. To establish that deficient performance prejudiced the defense, an appellant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Lafferty v. State*, 2007 UT 73, ¶ 13, 175 P.3d 530 (quoting *Strickland*, 466 U.S. at 694). "Reasonable probability is defined as probability sufficient to undermine confidence in the outcome." *Id.* (quotation simplified). "Proof of ineffective assistance of counsel must be a demonstrable reality and not a speculative matter." *State v. Hards*, 2015 UT App 42, ¶ 19, 345 P.3d 769 (quotation simplified).

¶27 In order to show that his trial counsel was constitutionally ineffective for failing to locate and introduce additional evidence in mitigation, Simpson must not only show "that counsel failed to seek mitigating evidence, but also that some actually

existed to be found." *See State v. Taylor*, 947 P.2d 681, 687 (Utah 1997). The absence of evidence cannot overcome *Strickland*'s "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Burt v. Titlow*, 571 U.S. 12, 23 (2013) (quotation simplified). To prove prejudice, it is not enough that a defendant merely "identif[ies] unexplored avenues of investigation," the defendant must also "demonstrate [to] a reasonable probability that further investigation would have yielded sufficient information to alter the outcome of [the] trial." *State v. Price*, 909 P.2d 256, 265 (Utah Ct. App. 1995) (quotation simplified).

¶28 Simpson argues that he was prejudiced when his counsel did not put on any evidence in mitigation. Specifically, Simpson argues that counsel should have investigated and presented possible mitigating evidence that Simpson had high blood pressure and diabetes, that Simpson had lived an "offense-free" life for the past fifteen years, that he was employed and has family support, that he was convicted of a juvenile offense for lewdness for which he participated in therapy for sexual dysfunction, and that he patronized prostitutes in the mid-1990s. Simpson argues that this "social history[,] which was part of the record[,] demands" a "reasonable investigation for purposes of mitigation." Such an investigation, Simpson argues, might have provided more detail about the root cause of his sexual deviancy. Simpson also argues that these facts, combined with details on how age and general ill health had affected him, could easily have suggested some element of mercy to the jury, and presenting this information was an absolute minimum in mitigation. Because the State was not seeking the death penalty and the jury was deciding between life without parole and life with the possibility of parole, Simpson argues that there was "nothing to lose in presenting *some kind* of mitigation evidence to attempt to sway the jury toward life with the possibility of parole." Simpson concludes that because counsel did not put on any evidence in

mitigation, the court should presume prejudice. We are not persuaded.

¶29    "[O]ur inquiry turns on whether a reasonable and impartial decisionmaker would have found the mitigating evidence omitted at sentencing significant and substantial enough to alter the outcome of [Simpson's] sentence." *See State v. Wright*, 2004 UT App 102, ¶ 20, 90 P.3d 644. All the evidence Simpson argues should have been presented in mitigation was known to the jury when it made its sentencing decision. Most of this evidence was presented to the jury by Simpson himself. In Simpson's statement to the jury, he told the jury about his upbringing, his pets, the sports he played, and that overall he had had a great childhood. He told the jury about his health problems, including high blood pressure and diabetes. He also stated that he had lived trouble-free for over fifteen years, maintained employment, and had family support. There was also testimony that Simpson frequented sex workers and that he was convicted of a juvenile offense in 1982 for lewdness "for which he was diagnosed and treated for sexual dysfunction."

¶30    Simpson contends that his "own plea to allow him some hope of parole based on his perception of what the jury should know cannot be viewed as a substitute for effective advocacy." While it is generally not advisable, and may be ineffective, for counsel to offer no evidence in mitigation, to succeed on an ineffective assistance of counsel claim, Simpson must not only show that his counsel's performance was deficient by not presenting mitigating evidence, but that this complained of inaction prejudiced him. There is no reason to suggest that counsel, rather than Simpson, offering the evidence that was known about Simpson would have substantially affected the jury's decision. At the sentencing phase, the jury learned that Simpson was already on parole for murder when he murdered Victim. It is unlikely that the jury would have been swayed had counsel presented evidence that Simpson had high blood

pressure and diabetes, and that since his second murder he had lived a trouble-free life—at least until he was arrested for that murder—maintaining employment and family support. There can be "no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decisionmaker." *Sears v. Upton*, 561 U.S. 945, 954 (2010) (per curiam) (quotation simplified).

¶31 Simpson's trial counsel may have had strategic reasons for not focusing on Simpson's lewdness crime, therapy, and patronization of sex workers. While Simpson argues that there was "nothing to lose," a standard that has not been adopted for evaluating *Strickland* claims, *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009), there was a potential risk in annoying the jury if counsel suggested those facts somehow diminished Simpson's culpability in the murder of a young female victim. As the State argues, "counsel could have recognized that any suggestion that patronizing [sex workers] is a sign of a troubling social history that should mitigate Simpson's responsibility for killing [such a victim] might offend and inflame the jury." Not focusing on Simpson's past of patronizing sex workers, lewdness crime, and therapy was "reasonable considering all the circumstances," *see Strickland v. Washington*, 466 U.S. 668, 688 (1984), and therefore we are not persuaded that "there was no conceivable tactical basis for counsel's actions," *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 (quotation simplified).

¶32 Simpson also contends that counsel should have performed more investigation to uncover further mitigation evidence, but he has not identified any further potentially mitigating evidence that this investigation might have uncovered. *See State v. Taylor*, 947 P.2d 681, 687 (Utah 1997). There is also no evidence in the record as to what investigation counsel may have done. Merely showing an absence of evidence cannot overcome *Strickland*'s strong presumption that counsel acted reasonably. *See Burt v. Titlow*, 571 U.S. 12, 23 (2013).

Therefore, Simpson has not met his burden to show that there was "a reasonable probability that further investigation would have yielded sufficient information to alter the outcome of his trial." *State v. Price*, 909 P.2d 256, 265 (Utah Ct. App. 1995) (quotation simplified). "[W]e are not convinced that [counsel's] failure to offer all possible mitigating evidence undermined the reliability of the verdict." *See State v. Arguelles*, 2003 UT 1, ¶ 85, 63 P.3d 731. Accordingly, Simpson has not established that his counsel's failure to offer evidence in mitigation prejudiced him, and therefore does not rise to the level of ineffective assistance of counsel.

CONCLUSION

¶33    We conclude that Simpson received effective assistance of counsel. Using the statements Simpson made to law enforcement in his defense was sound trial strategy. Further, Simpson has not established that he was prejudiced by counsel's failure to search for further evidence of mitigation or offer additional evidence in mitigation. Accordingly, we affirm Simpson's conviction and sentence.

———————