**2024 UT App 187**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JOSHUA SCOTT SCHOENENBERGER,
Appellant.

Opinion
No. 20190703-CA
Filed December 19, 2024

Second District Court, Farmington Department
The Honorable John R. Morris
No. 151701003

Scott L Wiggins, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and DAVID N.
MORTENSEN concurred.

LUTHY, Judge:

¶1 Joshua Scott Schoenenberger appeals his conviction of aggravated murder. He argues that the district court erred by ruling that his incriminating statements to police were voluntary and therefore denying a motion to suppress those statements. He further contends that the court plainly erred by rendering that decision before receiving an official transcript of his interrogation. Schoenenberger also asserts that the court applied an incorrect legal standard to deny his motion for a new trial.

¶2 In addition to those claims of error, Schoenenberger makes several claims of ineffective assistance by his trial counsel (Counsel). In conjunction with some of these claims, he has filed

a motion requesting a remand under rule 23B of the Utah Rules of Appellate Procedure for entry of factual findings necessary to establish his claims.

¶3     We see no error in the challenged actions of the district court. We determine that Schoenenberger has not demonstrated ineffective assistance on the relevant claims he raises in his appellate briefing. And we conclude that he has not met his burden under rule 23B on the ineffective assistance claims for which he requests a remand. We therefore deny his rule 23B motion and affirm his conviction.

BACKGROUND

¶4     During the early morning of May 9, 2015—"between 12:30 and 1:00 a.m."—Schoenenberger and his girlfriend (Mother) arrived at a hospital emergency room seeking care for Mother's two-year-old son (Child). Mother rushed in, carrying Child and screaming that he was not breathing. Child looked "lifeless" and "was covered in bruises." A nurse took Child to a room, and medical professionals began a "pediatric advanced life support" protocol on Child, who was "unresponsive" and "cold to the touch." Resuscitative efforts were successful in restoring Child's heartbeat. Once Child was "somewhat stabilized," it was discovered that Child also had a swollen abdomen and a prolapsed rectum. The doctor determined that an "exploratory surgery would be the best course," and one was performed. The surgery revealed "several areas of injury," including "a tear in the large intestine" and "some injury to the liver." These injuries indicated that Child had suffered "direct blunt force trauma to his abdomen."

¶5     Police were called to the hospital due to suspected abuse of Child. Three detectives arrived and spoke with Mother and Schoenenberger. When asked about what led to Child being rushed to the hospital, Schoenenberger explained that Child had

been left alone in the bathtub for a short amount of time and that Schoenenberger had returned to the bathroom to find Child unresponsive in the bathtub. Eventually, Mother and Schoenenberger were transported to the police station to be "interviewed further."

*The Interrogation*

¶6    At about 4:00 a.m., in an interview room at the police station, a detective advised Schoenenberger of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Schoenenberger indicated that he understood those rights and then confirmed that he wanted to talk to the police. Recordings were made of the interviews that followed.

¶7    Schoenenberger first recounted that the prior day, the family arrived home from a day trip to Salt Lake City at around 11:00 p.m. Schoenenberger said he took Child to the bathroom, unsuccessfully tried to get him to "go potty," and started a shower for him. Schoenenberger explained that Child started "flipping out" about taking a shower and that he therefore ran a bath for Child instead. Then, Schoenenberger said, while Child was in the bathtub, he left to lie down in his bedroom "for a minute." Schoenenberger explained that when he then "didn't hear any splashing," he returned to the bathroom to find Child "face down in the tub." Schoenenberger said that he called for Mother, and after trying to resuscitate Child for "about five minutes," they rushed Child to the hospital.

¶8    The detective then asked Schoenenberger about the bruising on Child's head, thigh, and stomach. Schoenenberger explained that earlier in the week, Child had fallen and hit his head in the shower and also on the bathroom floor, that the mark on his thigh was "a rash from his diaper," and that the marks on his stomach might have been from when Mother initially attempted chest compressions and "pumped him like three times real hard."

¶9    At about 6:00 a.m., another detective joined the interview. He informed Schoenenberger that Child had "extensive injuries consistent with physical abuse" and that there was "also evidence of sex abuse to [Child]." He also asserted that the information Schoenenberger had given so far had not been "sufficient to explain [Child's] injuries" and that he "need[ed] help trying to figure out what took place." Schoenenberger responded that he had already explained "everything that happened" and denied having abused Child in any way. Schoenenberger also denied that Mother abused Child in any way. And he repeated his narrative of finding Child "face down in the bathtub" and the possible innocent explanations for Child's injuries. Then at around 6:30 a.m., the interview concluded, and Schoenenberger was moved to a holding cell.

¶10    Schoenenberger was kept in a holding cell for the next several hours, during which time he was given smoke breaks and a meal. At around 11:00 a.m., however, Schoenenberger had an asthma attack, for which he was treated by medical professionals, who administered a breathing treatment. After this episode, Schoenenberger asked to speak with the detectives.

¶11    Schoenenberger was returned to an interview room, and the detectives engaged with him. The detectives explained that they had "done a lot of work" since Schoenenberger's arrival at the jail and that the emerging information "clearly indicate[d] that what happened to [Child] wasn't an accident." They stated that they no longer thought Child had been sexually abused but that they did believe that Schoenenberger had been physically abusing Child. The detectives reiterated the serious nature of Child's injuries and that he was "close to dying," and they pushed Schoenenberger to explain "why [he] physically abused [Child]." Schoenenberger forcefully continued to deny any wrongdoing. Then at about twenty-five minutes into this interview, Schoenenberger requested a lawyer, at which time he was returned to a holding cell.

¶12 Shortly after noon, Schoenenberger asked to speak with the detectives again, and he was returned to an interview room. The detectives came to the interview room and "went through a series of questions to verify with . . . Schoenenberger that [they] had not made any threats to him," "compelled him in any way," "made any promises," or "used any type of violence towards him" to induce him to "sit back in the interview room and speak with [them] again." They also received an "acknowledge[ment]" from Schoenenberger "that he realized he was waiving his prior statement of wanting an attorney." Schoenenberger then began to blame Mother for Child's injuries. He told the detectives that he had on several occasions seen Mother hit Child "with a belt" when "he wouldn't go to the bathroom" and that she "smacks him upside the head." He then said that the prior evening, Mother was the one alone with Child in the bathroom when Child was hurt. Schoenenberger stated that after Child started "flipping out" about having to take a shower, Mother came in and told Schoenenberger she would "take care of it." Schoenenberger said that he then "left the room" but soon "heard thrashing around" and that when he returned to the bathroom "to check," he found Mother "bawling" and Child looking "like he was dead." Schoenenberger then explained that he had initially told the detectives a different story because he "didn't want [Mother] to get in trouble."

¶13 The detectives explained that they were convinced Mother was not big or strong enough to cause Child's injuries, which could "only be caused by significant blunt-force trauma." Schoenenberger continued to maintain that Mother was the source of Child's injuries, and the detectives continued to express their disbelief of his new story. This interview ended at about 1:00 p.m.

¶14 At approximately 1:30 p.m., the detectives saw via the camera in the holding cell that Schoenenberger was lying on the floor, and they believed he might be having another medical

episode. When the detectives arrived at the cell, Schoenenberger was sitting up. And when the detectives entered the cell, he told them, without the detectives asking him any questions, "It was all me. I hurt that boy. There's nothing to talk about. I did it all."

¶15 Schoenenberger was again returned to an interview room, where he admitted that he hurt Child. He said that because he was frustrated with Child for not listening to him, he "got mad at" Child, grabbed Child around the waist, and "squoze him" for "[m]aybe 10 seconds." After that, Schoenenberger said, he tried to set Child down in the bathtub, but Child was unresponsive.

¶16 The detectives challenged Schoenenberger on his story, explaining that Mother had said she had heard repeated "skin-to-skin contact strikes" and Child screaming when Schoenenberger was alone with Child in the bathroom. Additionally, one of the detectives, who had left and contacted medical professionals caring for Child, told Schoenenberger that those professionals had said the injury could not have happened from squeezing and "the only way it could have happened is blunt-force trauma," meaning "something blunt hit [Child] hard enough to rupture his colon."

¶17 Schoenenberger then said that he had spanked Child a few times while they were in the bathroom and that he had dropped Child after squeezing him, but he otherwise continued to advance his prior explanation of the events. The interview ended at about 2:45 p.m.

¶18 Less than an hour later, Schoenenberger again asked to talk to the detectives, and he was returned for a final time to an interview room. When the detectives told him that his story "[didn't] add up," Schoenenberger told the detectives he had dropped Child on the tile outside the tub and then accidentally stepped on him "[o]n the belly." After further pressing by the detectives, Schoenenberger explained that he had intended to "step on [Child] like this"—apparently softly—and "squish him,"

but that he slipped and unintentionally "put all of [his] weight down on [his] foot." Shortly thereafter, at approximately 4:00 p.m., Schoenenberger said there was "nothing else to say," and the interview concluded.

### The Charge

¶19 Two days after having been brought to the hospital, Child died from his injuries. Thereafter, the State charged Schoenenberger with aggravated murder.

### The Motion to Suppress

¶20 Schoenenberger filed a motion to suppress, asserting that the detectives' questioning of him had violated his *Miranda* rights and asking the district court to exclude his statements as "the product of involuntary, coercive interrogations." After an evidentiary hearing and oral arguments on the matter, the court denied the motion. Although it had not received an official transcript of Schoenenberger's interrogation, the court stated that it would issue a written decision because it did have audio recordings and a partial unofficial transcript of the interrogation, and because it "[did] not wish to further delay the issuance of its ruling."

¶21 In its written ruling, the court articulated the relevant legal standard, "consider[ed] the totality of the circumstances," and concluded that Schoenenberger's statements were "knowing and voluntary" and "not a result of improper police coercion." The court specifically identified the following factors as underlying its decision: Schoenenberger had understood he had a right to counsel and a right to remain silent, he had "a level of sophistication with the justice system," there was no evidence that "any mental deficiencies or emotional instabilities" were at play, and he was "not subjected to a prolonged interrogation that would break down his barriers and compel him to confess when he otherwise would not have done so."

*The Trial*

¶22     The case proceeded to trial. At trial, the State presented the testimony of the medical professionals who had treated Child and the detectives who had interrogated Schoenenberger. It also showed the jury portions of the video recordings of Schoenenberger's interview sessions at the police station. Schoenenberger presented no witnesses in his defense.

¶23     During his closing argument, Counsel argued that Schoenenberger's confession had been coerced. Among other things, he stated, "I want you to think about when someone continues to talk to you over and over and over again how strong you all would be under those circumstances where someone's made up their mind that you've committed a crime." He suggested that a person in such a situation "might say something that puts a stop to this treatment, that puts a stop to his interrogation."

¶24     In his closing rebuttal argument, the prosecutor responded to Counsel's suggestion that Schoenenberger was coerced into admitting that he caused injuries to Child by arguing that Schoenenberger "is no shrinking violet," as evidenced by the fact that after a detective "read [Schoenenberger] his *Miranda* rights," including the right to "stop answering questions at any time," Schoenenberger exercised that right by "terminat[ing] one of the interviews himself."

¶25     The jury ultimately convicted Schoenenberger of aggravated murder, and he was sentenced to life in prison without parole.

*The Motion for a New Trial*

¶26     Schoenenberger then moved for a new trial on several grounds, including that the district court had made its suppression ruling prior to receiving an official transcript of the

interrogation and that in his closing rebuttal argument the prosecutor had "made reference to [Schoenenberger's] invocation of his right to counsel." The district court denied the motion. It first noted that with his motion, Schoenenberger had "not provide[d] any additional evidence or affidavits in support of his claims" and that the motion was therefore "insufficient." The court then went on to nevertheless examine Schoenenberger's argument "based upon the trial record."

¶27   As to the argument regarding a lack of an official transcript of Schoenenberger's interrogation, the court determined that such a challenge was untimely, coming "almost a year and a half" after the suppression ruling. Moreover, the court noted that even if the challenge had been timely, it would still fail because Schoenenberger had not identified any instances where the evidence in the official transcript "differ[ed] from that which was presented at the [suppression] hearing and which the court relied on in its [suppression] ruling" or "any analysis of why the court's [suppression] ruling adversely affected his right to a fair trial."

¶28   As to the argument regarding the prosecutor's closing rebuttal argument, the court determined that the prosecutor's reference to Schoenenberger's invocation of his *Miranda* rights "was made to dispute the claim of coercion by showing knowledge of and a willingness to invoke procedure under *Miranda*." The court therefore concluded that the prosecutor's statement could not "be construed as implying guilt by such invocation" and, thus, that the prosecutor's comment "did not cross into unconstitutional territory."

*The Appeal and Rule 23B Motion*

¶29   Following the district court's denial of his motion for a new trial, Schoenenberger appealed. And with his briefing on appeal, Schoenenberger has filed a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure, asking for an opportunity

to supplement the record with findings in support of a number of ineffective assistance of counsel claims. We provide additional information regarding Schoenenberger's rule 23B motion as we address it below.

ISSUES AND STANDARDS OF REVIEW

¶30    In his principal brief on appeal, Schoenenberger raises five claims of error. First, Schoenenberger asserts that the district court erred by failing to consider the totality of the circumstances when it ruled that his confession was voluntary and denied his motion to suppress. "In reviewing a trial court's determination on the voluntariness of a confession, we apply a bifurcated standard of review." *State v. Fullerton*, 2018 UT 49, ¶ 13, 428 P.3d 1052 (cleaned up). "Under this standard, the ultimate determination of whether a confession is voluntary is a legal question," which "we review . . . for correctness." *Id.* (cleaned up). But "[w]e set aside factual findings made by the district court only if they are clearly erroneous." *Id.*

¶31    Next, Schoenenberger raises two claims related to the district court ruling on his motion to suppress before it received an official transcript of his police interrogation. First, he contends that the district court committed plain error by ruling before receiving an official transcript. "The plain error standard of review requires an appellant to show the existence of a harmful error that should have been obvious to the district court." *State v. Ringstad*, 2018 UT App 66, ¶ 32, 424 P.3d 1052 (cleaned up), *cert. denied*, 425 P.3d 802 (Utah 2018). Relatedly, Schoenenberger then contends that Counsel's failure to object to the court ruling on the motion to suppress before receiving an official transcript amounted to ineffective assistance of counsel. "When, as in this case, [a] claim of ineffective assistance of counsel is raised for the first time on appeal, we resolve the issue as a matter of law." *State v. Robertson*, 2005 UT App 419, ¶ 5, 122 P.3d 895 (cleaned up).

¶32   Schoenenberger raises two claims related to his motion for a new trial as well. He first challenges the district court's denial of the motion, arguing that the court misapplied the standard that controls a review of a prosecutor's reference to a defendant's invocation of *Miranda* rights. "When reviewing a trial court's denial of a motion for a new trial, we will not reverse absent a clear abuse of discretion by the trial court. At the same time, however, we review the legal standards applied by the trial court in denying such a motion for correctness." *State v. Montoya*, 2017 UT App 110, ¶ 11, 400 P.3d 1193 (cleaned up). Schoenenberger also claims that Counsel provided ineffective assistance by "failing to file a sufficient motion for a new trial." As already noted, when such a claim "is raised for the first time on appeal, we resolve the issue as a matter of law." *Robertson*, 2005 UT App 419, ¶ 5 (cleaned up).

¶33   Finally, Schoenenberger has filed a motion for a remand under rule 23B of the Utah Rules of Appellate Procedure. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective," including facts that show "the claimed deficient performance" and "the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." Utah R. App. P. 23B(a)–(b).

¶34   We address Schoenenberger's briefed claims and his rule 23B motion in turn.

ANALYSIS

I. The Motion to Suppress

¶35   "The Fifth Amendment to the United States Constitution protects individuals from being compelled to give evidence against themselves." *State v. Rettenberger*, 1999 UT 80, ¶ 11, 984 P.2d 1009 (cleaned up). And "under the Due Process Clause [of

the Fourteenth Amendment], certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." *Id.* (cleaned up). "In order to determine whether a challenged confession [is] constitutional under the Fifth and Fourteenth Amendments, a court must examine the totality of circumstances to determine whether [the] confession [was] made freely, voluntarily and without compulsion or inducement of any sort." *Id.* ¶ 14 (cleaned up). This analysis must consider "the details of the interrogation"—for example, "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers"—as well as "the characteristics of the accused"—for example, "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶¶ 14–15 (cleaned up).

¶36 Schoenenberger argues that the district court erred by denying his motion to suppress his statements to the detectives because the court failed to consider the totality of the circumstances when it determined that his statements were constitutionally obtained. Specifically, Schoenenberger asserts that the court failed to consider several factors that weigh against a determination that he made his statements voluntarily. We discuss each of these factors in turn and then consider the combined impact of all the relevant factors as part of the totality-of-the-circumstances assessment that is required in this case.

A. False Statements by the Detectives

¶37 Schoenenberger contends that the district court gave "little [to] no consideration . . . to the objective factor of police trickery," asserting that there were a "number of times that [the] detectives made false statements to [him] in the course of the

interrogation." Our supreme court has determined that the mere existence of some deception on the part of police does not rise to police coercion, stating: "We have recognized that a defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *State v. Rettenberger*, 1999 UT 80, ¶ 20, 984 P.2d 1009 (cleaned up). But "in certain cases, police misrepresentations may be sufficiently egregious to overcome a defendant's will so as to render a confession involuntary." *Id.* The question, then, is whether "the number and nature of the misrepresentations" in a given case "exceeds that threshold." *Id.* Here we have no trouble deciding that any alleged misrepresentations of the detectives either were not actually misrepresentations or were not sufficiently egregious to have overcome Schoenenberger's will.

¶38 Schoenenberger first points to one detective's assertion during the initial interview at the police station that there was "evidence of sex abuse to [Child]." However, this assertion was based on the detective's knowledge that Child had a prolapsed rectum and on the detective's assumption that this condition was a result of sexual assault. Furthermore, toward the beginning of the detective's second interaction with Schoenenberger—long before Schoenenberger admitted to any responsibility for Child's injuries—the detective told Schoenenberger that he no longer believed that Child had been sexually abused. Thus, we have no reason to believe that the detective's early assertion that there was evidence of sexual abuse amounted to duplicity or that it ultimately had any coercive effect on Schoenenberger.

¶39 Second, Schoenenberger points to a detective's statement during his interrogation that Child was "close to dying." But again, we have no reason to think that this was trickery on the part of the detective because Child was in critical condition at the time

and Child's injuries were so extensive that he did, indeed, die just two days later.

¶40   Third, Schoenenberger points to the detectives' accusing him of abusing Child and telling him, "We've got substantial information that verifies you were, in fact, the one responsible for this." But, at that point in the investigation, the evidence *did* point to Schoenenberger as the party responsible for Child's injuries: by Schoenenberger's own account at that point, he was the only person that had been left alone with Child the previous night, he was the last person that had interacted with Child prior to his medical emergency, and Child's significant life-threatening injuries were incompatible with Schoenenberger's suggestions of drowning or accidental harm. The detectives' assessment that this amounted to "substantial information" of guilt certainly does not rise to the level of an egregious misrepresentation.

¶41   In sum, as to police trickery, Schoenenberger points to three asserted misrepresentations by the detectives that, at most, had only slight potential to lead Schoenenberger to believe that the detectives' "knowledge of his guilt [was] greater than it actually [was]," *id.* (cleaned up). And the "number and nature" of these statements does not suggest that they were "sufficiently egregious to overcome [Schoenenberger's] will so as to render [his] confession involuntary." *Id.*; *see also id.* ¶¶ 21, 23 (determining that the "[e]xtreme duplicity" used by the police "raise[d] serious doubt about" a confession's reliability where "[t]he district court cataloged some 36 false statements made to [the defendant] by the police during his interrogation" and "[t]he overwhelming majority of these misrepresentations were not merely 'half-truths' but were complete fabrications about testimonial and physical evidence of [the defendant's] guilt").

B.    The False-Friend Technique

¶42   Schoenenberger asserts that the detectives also "often utilized" the false-friend technique, "indicating to [him] that they

understood his plight" and "were acting in his best interest." The false-friend technique "is commonly used in police interrogations because [resistance] to the disclosure of information is considerably increased if something is not done to establish a friendly and trusting attitude on the part of the subject." *State v. Rettenberger*, 1999 UT 80, ¶ 24, 984 P.2d 1009 (cleaned up). In some circumstances, however, the technique can be coercive. *Id.* ¶ 26. In fact, the technique "may be ideally suited to extract an involuntary confession from certain types of suspects who, . . . [due to cognitive deficits, are] overly compliant, submissive, and anxious to receive reassurance and approval from other people." *Id.* Thus, while use of the technique is not, "standing alone, sufficiently coercive to produce an involuntary confession," constitutional concerns may arise when its use is viewed "in relation to other tactics and factors." *Id.* ¶ 28.

¶43    Here, however, Schoenenberger's false-friend technique argument points only to the detectives' use of the technique in isolation, uncoupled from any other troubling tactic or factor. Schoenenberger points to several instances where the detectives expressed understanding, encouraged Schoenenberger to "do the right thing," or stated that he was not "a bad guy." But he does not assert that use of the false-friend technique was associated with other tactics or factors that combined with it to indicate potential coercion, and we see no indication that Schoenenberger came to believe that the detectives "were not his adversaries but were looking out for his best interests." *Id.* ¶ 27. Thus, to the extent the detectives used the false-friend technique, we remain unconvinced that it was "sufficiently coercive to produce an involuntary confession." *Id.* ¶ 28.

C.    Promises of Leniency

¶44    Schoenenberger asserts that another factor the district court failed to consider was that "the detectives utilized implied promises of leniency." *See generally State v. Rettenberger*, 1999 UT

80, ¶ 29, 984 P.2d 1009 ("We have recognized that an interrogation can be impermissibly coercive because it carried a threat of greater punishment or a promise for lesser punishment depending on whether a defendant confessed." (cleaned up)). But he directs us to no such promises made by the detectives during the interrogation. Nor have we found any in our own review of the record. Furthermore, when Schoenenberger asked to talk to the detectives again after he had requested an attorney, the detectives asked him "a series of questions" to clarify that he was waiving his prior request for an attorney and that the detectives "had not compelled him in any way, *or made any promises*, or used any type of violence towards him in order for him to sit back in the interview room and speak with [them] again." (Emphasis added.) Accordingly, we determine that the voluntariness of Schoenenberger's confession was not impacted by any promises of leniency from the detectives.

D.    Persistent Suggestion of Facts

¶45    Schoenenberger next contends that a questionable tactic the detectives used was to "continually suggest[] facts about injuries that would satisfy what they believed would fit physical evidence as they knew it." *See generally State v. Rettenberger*, 1999 UT 80, ¶¶ 14, 44, 984 P.2d 1009 (stating that "under the totality of circumstances test," courts must consider "the persistence of the officers," and finding significance in the fact that "officers had directly or indirectly given [the defendant] virtually all the facts that he used in his confession"). As to the persistence of the detectives, we conclude that some level of persistence on the part of law enforcement is entirely appropriate; indeed, "we think it eminently reasonable that police officers challenge criminal suspects' questionable explanations in their pursuit of the truth and their efforts to solve crimes." *State v. Montero*, 2008 UT App 285, ¶ 13, 191 P.3d 828. As to the detectives suggesting facts to Schoenenberger in an effort to get him to admit those facts, Schoenenberger cites no authority indicating that it was alone

improper for the detectives to tell Schoenenberger what they thought happened to Child or to forcefully assert that those things must have happened. The important question is not whether the detectives asserted or suggested a theory of what happened but, rather, whether those assertions and suggestions combined with other tactics and factors to ultimately overcome Schoenenberger's will and render his resulting confession involuntary. *See Rettenberger*, 1999 UT 80, ¶¶ 40–45.

¶46 Here, the details of Schoenenberger's confession confirm that the detectives' persistent assertions about what happened to Child did not overcome Schoenenberger's will. Schoenenberger pushed back—on many occasions and quite forcefully—on the detectives' assertions. And when Schoenenberger admitted to harming Child, he related scenarios—squeezing, dropping, and stepping on Child—that had not been first suggested by the detectives, who had instead repeatedly stated their belief that Schoenenberger must have punched or beaten Child. None of this suggests that Schoenenberger's will was overborne by the detectives' forceful and persistent suggestion of facts. *See State v. Prows*, 2011 UT App 9, ¶ 12, 246 P.3d 1200 (determining that the defendant's will was not overborne where, among other factors, the defendant "did not agree with every assertion made by the police officers or simply parrot back details suggested by them" but, instead, "provided the details of his confession on his own and disagreed with several assertions the police officers made regarding the abuse").

E.      The Passage of Time

¶47 Schoenenberger also challenges the district court's determination that he was not subjected to a prolonged interrogation. On this point, the court explained:

> Although [Schoenenberger] was in custody at the police station for over ten hours, he was only subjected to interrogation for a few of those hours.

> The first interview lasted less than two and a half hours, which ended when [Schoenenberger] invoked his right to counsel. Absent [Schoenenberger's] subsequent initiations of interviews and interactions with the police, there is no evidence suggesting the police would have asked any further questions. No evidence was presented that the police continually interrupted him while in the holding cell, preventing him from sleeping.

The court's summary of these events is accurate. Indeed, apparently recognizing that the intervals of police-initiated *interrogation* were not unconstitutionally long, Schoenenberger argues that the *isolation* he experienced at the police station "aggravated" his condition.

¶48 The only authority Schoenenberger cites on this point is *State v. Rettenberger*, 1999 UT 80, 984 P.2d 1009, a case reiterating the general rule that "the passage of time can, in some circumstances, dissipate any lingering effects of police coercion," but determining that the passage of time between interrogation sessions in that case was *not* curative of the coercion that occurred during the defendant's interrogation sessions. *Id.* ¶ 34 (cleaned up). And *Rettenberger* is easily distinguishable from this case on this point. There, the defendant's two interviews were separated by twenty-two hours of solitary confinement, and an expert testified that such isolation "would have caused [the defendant] to have increased vulnerability and anxiety, compromising his ability to make decisions." *Id.* (cleaned up). Here, on the other hand, the time between Schoenenberger's first interview and the later interviews (which were each the result of Schoenenberger's requests to talk with the detectives) was less than five hours. And during that time and the other time he was at the police station, Schoenenberger was given opportunities to eat and drink, rest, and take multiple smoking and bathroom breaks. Given these facts, we cannot say that the district court erred in its

determination that Schoenenberger "was not subjected to a prolonged interrogation that would break down his barriers and compel him to confess when he otherwise would not have done so."

F. Totality of the Circumstances

¶49 After a full consideration of the factors addressed above as well as the other factors specifically elaborated on by the district court (namely, that Schoenenberger understood his right to counsel and understood that "he did not need to speak to the police"; that there was no evidence that he "was experiencing erratic emotions" around the time of his confession; that there was no evidence that he "had any mental deficiencies or emotional instabilities that would undermine his explicit waivers"; that he had "a level of sophistication with the justice system"; and that he was "not subjected to a prolonged interrogation that would break down his barriers and compel him to confess"), we see no error in the district court's determination that Schoenenberger's confession was voluntary. The State met its burden "to demonstrate by a preponderance of the evidence that [Schoenenberger's confession] was made voluntarily based upon the totality of circumstances," *State v. Rettenberger*, 1999 UT 80, ¶ 45, 984 P.2d 1009 (cleaned up), and we therefore affirm the district court's denial of Schoenenberger's motion to suppress.

## II. The Interrogation Transcript

A. The District Court's Failure to Wait for an Official Transcript

¶50 Schoenenberger asserts that the district court plainly erred by ruling on his motion to suppress before receiving "complete transcripts of the interrogation." Specifically, he challenges the court's determination "that the audio recording of the interviews, along with the transcripts already provided, [were] a sufficient record upon which to rule."

¶51    "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful. If any one of these requirements is not met, plain error is not established." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (cleaned up). "For an error to be obvious to the trial court, the party arguing for [plain error] must show that the law governing the error was clear or plainly settled at the time the alleged error was made." *Id.* ¶ 21 (cleaned up).

¶52    Schoenenberger has failed to establish the existence of an error—let alone an obvious error—by the district court when it ruled on his motion to suppress based on the recordings of the interrogation and a partial unofficial transcript. He simply broadly asserts an obvious error "in light of case law from both the United States Supreme Court and Utah concerning the fundamental constitutional right to a fair trial and the presumption of innocence." Yet Schoenenberger directs us to no case suggesting that the action of the district court in any way infringed upon his right to a fair trial and the presumption of innocence. Nor does he explain why the court would have been unable to conduct the required totality of the circumstances analysis with the information already before it—particularly the available audio recordings of the interviews. Because of these failings, Schoenenberger has not established plain error on the part of the district court.

B.    Counsel's Failure to Object

¶53    Relatedly, Schoenenberger argues that Counsel was ineffective for failing to object to the district court ruling on his motion to suppress before receiving an official transcript of the full interrogation. "To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. A defendant's inability to establish either

element defeats a claim for ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023).

¶54 Here, because Schoenenberger has not established that the district court ruling on the motion based on recordings and an unofficial transcript was error, he cannot establish that it was deficient performance for Counsel not to have challenged that action. Furthermore, it is clear from the court's ruling that Counsel *had* already "requested that the Court defer its ruling until more complete transcripts of the police interviews were made available" and that the court had determined that delay was unnecessary. Thus, it would have been entirely reasonable for Counsel to conclude, based on the court's articulated position on the matter, that an objection based on the lack of an official transcript would have been futile. *See State v. Kelley*, 2000 UT 41, ¶ 26, 1 P.3d 546 ("Failure to raise futile objections does not constitute ineffective assistance of counsel."). For these reasons, Schoenenberger has not shown that Counsel performed deficiently; thus, this ineffective assistance claim is unavailing.

### III. The Motion for a New Trial

#### A. The District Court's Ruling

¶55 Schoenenberger argues that the district court misapplied the proper legal standard when it considered his motion for a new trial. Specifically, he argues that the court misapplied the standard established by the United States Supreme Court in *Doyle v. Ohio*, 426 U.S. 610 (1976). But Schoenenberger is mistaken.

¶56 "In *Doyle*, the Court held that the use for impeachment purposes of a defendant's exercise of his right to silence violates due process." *State v. Maas*, 1999 UT App 325, ¶ 16, 991 P.2d 1108. "*Doyle* rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then

using his silence to impeach an explanation subsequently offered at trial." *Id.* ¶ 19 (cleaned up). But "a *Doyle* violation involves more than simply referring to a defendant's post-*Miranda* silence." *Id.* ¶ 20. To violate *Doyle*, "[a] prosecutor must specifically inquire about or argue using a defendant's exercise of his rights in a context that would impeach a defendant's exculpatory explanation of his conduct." *Id.* Thus, "[t]he key is the framing of a question or a prosecutor's comment that demands an explanation from the defendant and raises the inference that silence equals guilt." *Id.*

¶57 Schoenenberger's motion for a new trial challenged as inappropriate under *Doyle* the following statements from the prosecutor's closing rebuttal argument:

> [Counsel] also wants you to believe that the defendant was coerced into admitting to causing the injuries to [Child] by coercive police tactics when he was interviewed by detectives on May 9. I will submit to you this defendant is no shrinking violet, and you can see that in the interviews. Before they started interviewing the defendant, [one of the detectives] read the defendant his *Miranda* rights, in which he told the defendant that he could stop answering questions at any time. The defendant knew that because he terminated one of the interviews himself.

Schoenenberger contends that this argument was improper because it used his invocation of his rights "for impeachment purposes of the claim that [his] statements during the interrogation had been coerced." We disagree.

¶58 As the district court correctly recognized, because the prosecutor's reference "was made to dispute the claim of coercion by showing knowledge of and a willingness to invoke procedure under *Miranda*," it "was not correlative with guilt or to be

construed as implying guilt by such invocation, and therefore did not cross into unconstitutional territory." In other words, the prosecutor's statements did not "raise[] the inference that silence equals guilt," *id.*; rather, the statements asserted that Schoenenberger's silence equaled a knowledge of and willingness to assert his *Miranda* rights. *See id.* ¶ 25 ("When an officer simply testifies about the circumstances surrounding an interview, a part of which is defendant's silence, without using defendant's silence to impeach her credibility, there is no violation of the *Doyle* principle."). We therefore see no error in the district court's understanding or application of the governing legal standard.

## B.     Counsel's Failure to File a Properly Supported Motion

¶59    Also with regard to the motion for a new trial, Schoenenberger asserts that Counsel rendered ineffective assistance by failing "to file a properly supported motion." Again, "to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. A defendant's inability to establish either element defeats a claim for ineffective assistance of counsel." *State v. Miller*, 2023 UT App 85, ¶ 25, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023). And "to satisfy the prejudice prong, the defendant must present sufficient evidence to support a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* ¶ 27 (cleaned up).

¶60    We take Schoenenberger's point that, as noted by the district court, the motion for a new trial was "insufficient" because it "did not provide any additional evidence or affidavits in support of [Schoenenberger's] claims" and did not show that there had been "a substantial adverse effect on [Schoenenberger's] rights." *See generally* Utah R. Crim. P. 24(b) ("The motion [for a

new trial] shall be accompanied by affidavits or evidence of the essential facts in support of the motion.").

¶61    But even if this amounts to deficient performance on the part of Counsel, Schoenenberger must still show that this deficient performance prejudiced him. That is, he must point to the evidence and legal analysis that should have been included in the motion and explain how inclusion of that evidence and argument would have likely resulted in a different outcome. Yet Schoenenberger utterly fails in this task; his argument is entirely conclusory, asserting only that if Counsel had filed a motion that included citation to "supporting case law or authority," then the court would have been able to "properly analyze the issue, which would have resulted in a more favorable outcome for [him]." He does not point to what that supporting authority would be. Thus, Schoenenberger has failed to carry his burden on this claim, and we do not consider it further.

¶62    Because Schoenenberger has not demonstrated that the district court misapplied the appropriate legal standard when ruling on his motion for a new trial, and because he has not demonstrated that there is a reasonable likelihood that the court would have ruled differently on his motion for a new trial absent Counsel's assertedly deficient performance, we affirm the court's denial of Schoenenberger's motion for a new trial.

IV. The Rule 23B Motion

¶63    Schoenenberger has filed a motion under rule 23B of the Utah Rules of Appellate Procedure, seeking a remand to address a number of additional allegations of ineffective assistance of counsel. *See generally* Utah R. App. P. 23B(a) ("A party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel."). Schoenenberger claims that Counsel was ineffective in three ways not already addressed: (1) by not fully investigating

certain aspects of Schoenenberger's interrogation, (2) by not investigating the substance of a Division of Child and Family Services (DCFS) report filed after Child arrived at the hospital, and (3) by making an insufficient presentation of mitigating evidence at sentencing.

¶64   A rule 23B motion "will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* Thus, to be successful on a rule 23B motion, "a defendant must present the court with the evidence he intends to present on remand and explain how that evidence supports *both prongs* of the ineffective assistance of counsel test." *State v. Gallegos*, 2018 UT App 192, ¶ 23, 437 P.3d 388 (emphasis added) (cleaned up), *aff'd*, 2020 UT 19, 463 P.3d 641. "To satisfy the deficient performance prong, the defendant must establish that defense counsel's actions fell below an objective standard of reasonableness. To that end, the defendant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Miller*, 2023 UT App 85, ¶ 26, 535 P.3d 390 (cleaned up), *cert. denied*, 540 P.3d 78 (Utah 2023). To establish the prejudice prong of the test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

¶65   We agree with the State that Schoenenberger has not met his burden to proffer evidence that, if believed, could prove both elements of any of the ineffective assistance of counsel claims asserted in his rule 23B motion.

A.   Counsel's Alleged Failure to Fully Investigate Schoenenberger's Interrogation

¶66   Schoenenberger first attacks the adequacy of Counsel's investigation of the circumstances surrounding his interrogation,

arguing that Counsel's assertedly deficient performance in this regard contributed to the denial of his motion to suppress. Schoenenberger claims that Counsel was ineffective in his investigation related to the interrogation in four specific ways: (1) by not investigating and retaining an expert on coercion and false confessions, (2) by not investigating whether the police knew of Schoenenberger's alleged opioid use, (3) by not investigating whether the detectives made any promises to Schoenenberger, and (4) by not investigating conversations between Schoenenberger and the detectives that were not transcribed. As to each of these claims, we conclude that Counsel's performance was not deficient.

> 1. Investigation and Retention of an Expert on Coercion and False Confessions

¶67 In support of his claim that Counsel performed deficiently by not investigating or retaining an expert on coercion and false confessions, Schoenenberger has submitted an affidavit from a professor of psychology (Professor). Professor has prepared a report in which, based on factors of social and physical isolation, length of the interrogation, alleged drug withdrawal, maximization techniques and themes, and minimization and justification, he opines that Schoenenberger's interrogation was "psychologically coercive in the extreme." Based on Professor's report, Schoenenberger contends that Counsel performed deficiently by not investigating and retaining an expert on coercion and false confessions.

¶68 However, Schoenenberger has proffered no affidavit evidence—from Counsel or anyone else with knowledge—that Counsel did not investigate or consult an expert concerning coercion and false confessions. It is therefore possible, given what has been presented to us, that Counsel consulted such an expert and reasonably determined, based on what he learned, not to present such expert evidence at trial. Thus, Schoenenberger's

failure to produce affidavit evidence that Counsel failed to investigate or consult an expert is fatal to Schoenenberger's claim. *See State v. Price*, 909 P.2d 256, 264 (Utah Ct. App. 1995) ("Because [the] defendant has failed to allege that an exhaustive investigation was not completed by his attorneys, we presume they fulfilled that duty."), *cert. denied*, 916 P.2d 909 (Utah 1996).

¶69 Moreover, even if we assume that Counsel did fail to investigate and find an expert whose testimony would have been consistent with Professor's opinions, Schoenenberger still has not demonstrated deficient performance because Professor's opinions are unreliable. Professor's report states, for example, that Schoenenberger's interrogation (including the time that he was alone in a cell) was "approximately 16.5 hours." But this erroneously overstates the total time that the court found that Schoenenberger was in custody (a little over ten hours) as well as the time that the court found that Schoenenberger was subjected to active interrogation (only "a few of those hours"). It also ignores Schoenenberger's role in prolonging the interrogation by repeatedly asking to speak with the detectives after they had concluded their questioning. Reasonable counsel could have concluded that the risks of presenting testimony from an expert who has relied on erroneous facts outweighs the potential benefits of presenting such testimony.

>  2.  Investigation of the Detectives' Knowledge of Schoenenberger's Alleged Opioid Use

¶70 Schoenenberger has presented an affidavit from a private investigator (Investigator 1), who states that by reviewing reports completed by the detectives and video recordings from inside the jail, she has learned that the detectives knew (a) that Schoenenberger had visible needle marks on his arm and appeared to be fidgety and sweating while at the hospital; (b) that Schoenenberger was "trying to get clean," was "in a drug treatment program" and taking suboxone, and had last used

heroin "about a week" before; and (c) that police had not found any drugs in Schoenenberger's home, only some new, clean syringes. Schoenenberger has also presented an affidavit from a licensed counselor, who states that an opioid user could experience withdrawal "within hours of nonuse" and that withdrawal symptoms, if severe enough, could contribute to coercion. Based on this affidavit testimony, Schoenenberger argues that Counsel performed deficiently by not investigating whether the police knew of Schoenenberger's alleged opioid use and leveraged his alleged withdrawal to procure his incriminating statements.

¶71 Again, however, Schoenenberger has not presented affidavit evidence that Counsel did not investigate a possible theory of opioid withdrawal contributing to Schoenenberger making incriminating admissions. And again, this failure is fatal to Schoenenberger's claim. *See State v. Price*, 909 P.2d 256, 264 (Utah Ct. App. 1995), *cert. denied*, 916 P.2d 909 (Utah 1996). Additionally, Schoenenberger has submitted no affidavit—from himself or anyone else with knowledge—detailing his alleged drug use and withdrawal. Prior drug use and sweating do not necessarily equate to withdrawal, let alone withdrawal severe enough to have affected the voluntariness of Schoenenberger's statements. For these reasons, Schoenenberger again has not met his rule 23B burden of submitting affidavit evidence of facts that, if true, could establish Counsel's deficient performance.

      3.    Investigation of Whether the Detectives Made Promises to Schoenenberger

¶72 Schoenenberger has presented an affidavit from a second private investigator (Investigator 2), who recounts facts contained in the report of the medical personnel who assisted Schoenenberger during his asthma attack in jail. Schoenenberger asserts that Counsel was ineffective by not investigating what happened during that episode, claiming that if Counsel had done

so, he would have discovered that Schoenenberger "was promised that things would be better for him if he would work with the [detectives]" and that he "was promised his medications if he would speak with the [detectives]." There are at least two flaws with this argument.

¶73    First, Schoenenberger misrepresents what was said during the medical episode. As reported by Investigator 2, during that episode Schoenenberger told one of the medical personnel that he needed his medications and wanted to go to the emergency room; that person told Schoenenberger that he "didn't think [Schoenenberger] needed to go but if he felt that he needed to that would be fine" and explained to Schoenenberger that "going to the ER would lengthen and complicate the situation with the officers," so "if he really wasn't having a medical issue it would be better for him if he would just work with the officers"; and Schoenenberger responded by "agree[ing] to speak with [the officers] if they could get him his psychiatric medications" and "they agreed." Thus viewed, this episode did not contain a promise by the detectives or anything else coercive. The first statement was by one of the medical personnel and was merely a suggestion that it would be better to resolve the situation with the detectives rather than waste time at the emergency room for a non-emergency. The second statement was by Schoenenberger, who said that he wanted to speak further with the detectives but wanted his medication first. And the last statement was an indication by the detectives that they agreed to his terms. The detectives' acquiescence to Schoenenberger's request for medication—rather than withholding it—was not coercive. *See State v. Apodaca*, 2019 UT 54, ¶ 46, 448 P.3d 1255 (holding that there was no police coercion where detectives did not "deny [the defendant] access to . . . medication").

¶74    Second, Schoenenberger makes no effort to show that the identified statements by medical personnel and the detectives during and after Schoenenberger's medical episode overcame his

will. It would be one thing if the detectives had refused to give Schoenenberger his medication unless he confessed. But that is not what happened. Investigator 2's affidavit recounts that Schoenenberger was the one who offered to speak more in exchange for his medications and that the detectives merely agreed to his proposal. We have been provided no authority or analysis explaining how an officer's acceptance of a defendant's gratuitous offer to speak on the condition that the defendant be given medication constitutes the type of promise that could overcome the defendant's will.

¶75   For the foregoing reasons, we conclude that a competent attorney could reasonably choose to omit from a coercion argument the mention of an officer's acceptance of the defendant's offer to speak on the condition that the defendant is given medication.

> 4.   Investigation of Un-transcribed Conversations of Schoenenberger and the Detectives

¶76   In her affidavit, Investigator 1 also states that her "investigation revealed that there are recordings that do not appear to have been mentioned or transcribed, professionally or by the detectives," and that these previously un-transcribed statements are "critical to this case." Schoenenberger points to this affidavit evidence to argue that Counsel's failure to investigate the previously un-transcribed conversations amounted to ineffective assistance of counsel.

¶77   But again, Schoenenberger has presented no affidavit evidence that Counsel did not review the previously un-transcribed recordings, and because we must therefore presume that Counsel acted reasonably and did review them, the lack of affidavit evidence of Counsel's alleged failure is again fatal to Schoenenberger's claim. *See State v. Price*, 909 P.2d 256, 264 (Utah Ct. App. 1995), *cert. denied*, 916 P.2d 909 (Utah 1996). Moreover, a reasonable attorney could have determined that none of the

previously un-transcribed conversations would have been helpful to prove that Schoenenberger's incriminating statements were not voluntarily made.

¶78   Investigator 1 identifies a six-word exchange between Schoenenberger and Mother at the jail that ends with Schoenenberger saying, "I am going . . . ." This statement is simply too ambiguous. And, even if Investigator 1's speculation that by this statement Schoenenberger was telling Mother that he was going to take responsibility for Child's injuries is accurate, Schoenenberger has failed to show that the exchange has any bearing on the question of coercion. Not all confessions are involuntary, so the mere fact that Schoenenberger may have told Mother that he planned to confess before he actually did so says nothing about whether Schoenenberger's confession was coerced.

¶79   Investigator 1 next identifies a previously un-transcribed exchange in which one of the detectives told Schoenenberger about the charges he and Mother may face, explained that neither dropping Child nor giving him CPR would account for Child's injuries, and implored Schoenenberger not to tell him what he wanted to hear but to tell him only what actually happened, to which Schoenenberger declared that he did not hit Child. This exchange is similar to parts of the interview that were unofficially transcribed prior to the court ruling on Schoenenberger's motion to suppress, so a competent attorney could have reasonably decided not to highlight it in making the suppression motion.

¶80   Investigator 1 also identifies a conversation between the detectives about how long Schoenenberger had been in custody and how often he had changed his story. But this exchange reveals nothing that the court did not already know when it ruled on the voluntariness of Schoenenberger's incriminating statements. Accordingly, reasonable counsel could have decided not to highlight this exchange in connection with the suppression motion.

¶81 For the foregoing reasons, Schoenenberger has failed to produce affidavit evidence of facts that, if proved, could demonstrate that Counsel performed deficiently by failing to investigate previously un-transcribed statements made at the jail by Schoenenberger and others.

B. Counsel's Alleged Failure to Investigate a DCFS Report

¶82 Investigator 1's affidavit also details the contents of a DCFS report made after Child was admitted to the hospital. In his rule 23B motion, Schoenenberger contends that this affidavit testimony supports an ineffective assistance of counsel claim based on Counsel's alleged failure to investigate the DCFS report, which, he says, "includes statements by [Mother] and family members" that could have been used to challenge Mother's credibility at trial. But as with his other claims, Schoenenberger proffers no evidence that Counsel did not review the DCFS report. *See generally State v. Price*, 909 P.2d 256, 264 (Utah Ct. App. 1995), *cert. denied*, 916 P.2d 909 (Utah 1996). Moreover, Schoenenberger's explanation of what Counsel could have done with the information in the report is wholly undeveloped. He merely identifies a couple of minor contradictions about issues unrelated to Child's injuries and asserts that this information was "critical to challenging the credibility of [Mother]." He does not even explain how this information would have been admissible—it does not appear to be relevant to any issue at trial and is hearsay upon hearsay that is not subject to any identified exception to the rule against hearsay. Under these circumstances, a competent attorney could have reasonably concluded that the report provided little if any value and, therefore, reasonably decided to focus his limited time and resources on other matters.

C. Counsel's Alleged Failure to Present Sufficient Mitigating Evidence at Sentencing

¶83 Schoenenberger has presented an affidavit from a long-time mitigation investigator (Mitigation Expert), who opines that

"the collection, preparation, and presentation of the mitigation evidence in Mr. Schoenenberger's case was grossly incomplete and inadequate." On the basis of Mitigation Expert's affidavit, Schoenenberger contends that Counsel provided ineffective assistance at sentencing by (1) failing to investigate a "mental health defense" focused on an alleged "undiagnosed mental illness" and (2) failing to call in his behalf any witnesses at sentencing.

### 1.     Mental Illness Defense

¶84     Mitigation Expert's affidavit states that Counsel retained a mitigation investigator and gathered documents related to mitigation and sentencing, including Schoenenberger's school, medical, drug treatment, and jail records. Mitigation Expert then states that there are "numerous indications in the records collected that Mr. Schoenenberger likely suffers from an undocumented mental illness." Most specifically, Mitigation Expert notes as follows:

> [L]ess than 2 months after his arrest in this case, Mr. Schoenenberger requested mental health assistance in the Davis County Jail. Mr. Schoenenberger reported experiencing auditory hallucinations, that his mind was "racing," and he was having trouble sleeping as a result. The jail staff prescribed Mr. Schoenenberger an anti-psychotic medication to treat his symptoms. Mr. Schoenenberger continued to receive a variety of mental health medications to treat his ongoing symptoms through his incarceration at the Davis County Jail prior to his sentencing in 2019.
>
> Despite Mr. Schoenenberger self-reporting mental health symptoms to the jail medical staff, who confirmed that he was suffering from significant mental health symptoms throughout the

time of his incarceration leading up to trial and sentencing, Mr. Schoenenberger's defense team never requested a full psychological evaluation prior to sentencing.

Based on the foregoing, Schoenenberger contends that Counsel rendered ineffective assistance by failing "to properly investigate and develop . . . mental health evidence for presentation at . . . sentencing."

¶85 However, despite presenting evidence of the foregoing facts (of which Counsel was also presumably aware since, as Mitigation Expert explains, Counsel provided the documents upon which Mitigation Expert relies to assert these facts), Schoenenberger has proffered no evidence that Counsel did not investigate a potential mental illness defense for presentation at sentencing. We must therefore presume that Counsel conducted such an investigation, that his investigation was reasonable, and that his decision not to present a mental health defense at sentencing was reasonable as well. *See State v. State v. Price*, 909 P.2d 256, 264 (Utah Ct. App. 1995) ("Because [the] defendant has failed to allege that an exhaustive investigation was not completed by his attorneys, we presume they fulfilled that duty."), *cert. denied*, 916 P.2d 909 (Utah 1996). On the record before us, it is possible that Counsel performed a reasonable investigation of a mental health defense and reasonably determined that presenting such a defense would make Schoenenberger look worse.

¶86 In this regard, it is also noteworthy that Schoenenberger has proffered no evidence that he was willing to cooperate with Counsel in pursuing a mental health defense. Schoenenberger refused to cooperate with Adult Probation and Parole as it prepared its presentence investigation report, instead simply maintaining his innocence. If he similarly refused to cooperate with Counsel in obtaining a mental health evaluation or other

efforts to develop or present a mental illness defense, it is difficult on this record to see how Counsel's performance in this area could be deemed deficient. *See generally Strickland v. Washington*, 466 U.S. 668, 691 (1984) ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

¶87 Because we have been provided with no evidence that Counsel did not explore the possibility of a mental illness defense at sentencing, no evidence that Schoenenberger was unable to cooperate with Counsel in preparing such a defense, and no evidence that Schoenenberger was willing to cooperate with Counsel in preparing such a defense, we conclude that Schoenenberger has failed to proffer facts that, if true, could prove the deficient performance prong of this claim of ineffective assistance of counsel.

### 2. Mitigation Witnesses

¶88 Finally, Mitigation Expert states in his affidavit that he "telephonically interviewed 4 potential mitigation witnesses . . . that were significant people in [Schoenenberger's] life, including his mother, former stepfather, maternal aunt, and lifelong friend." And he avers that Counsel did not interview these four potential mitigation witnesses.[1] Yet Mitigation Expert does not say what

---

1. Mitigation Expert actually states that the mitigation investigator "did not interview *any* potential mitigation witnesses, . . . despite the mitigation investigator indicating in billing documents that at least one or more of the witnesses had been interviewed." (Emphasis added.) Mitigation Expert provides no foundation for how he would know that the mitigation investigator did not interview any potential mitigation witnesses, especially where the mitigation investigator's own billing records show that he did interview some potential

(continued…)

any of these four witnesses would have testified to if they had been called to testify at sentencing. Mitigation Expert does state that Schoenenberger's "parents were 17 years old at the time of his birth," that his "early life was very unstable," and that as a child he "suffered from a continual cycle of abuse and abandonment" from many of the men in his life, including physical abuse, and that he suffered from emotional abuse and neglect by his mother as well. But Mitigation Expert does not indicate whether he learned this information from the four potential mitigation witnesses or from Schoenenberger's school, medical, and drug treatment records. Without a proffer of what the four potential mitigation witnesses would have testified to had they been called, Schoenenberger is unable to demonstrate a reasonable likelihood of a different sentence if these potential witnesses had testified. *See State v. Curtis*, 2013 UT App 287, ¶ 54, 317 P.3d 968 ("Proof of prejudice must be a demonstrable reality, not mere speculation . . . ." (cleaned up)). In fact, Schoenenberger makes no attempt in his rule 23B motion to demonstrate prejudice resulting from Counsel's failure to call mitigation witnesses at sentencing. Thus, he has not met his burden with regard to the second prong of this ineffective assistance claim.

¶89    In sum, as to each of the ineffective assistance of counsel claims for which Schoenenberger seeks a remand under rule 23B, we conclude that he has failed to proffer facts that, if true, could establish both elements of the particular claim. We therefore deny Schoenenberger's motion.

---

mitigation witnesses. However, for purposes of our analysis, we nevertheless credit Mitigation Expert's statement that the mitigation investigator did not interview the four potential witnesses Mitigation Expert interviewed because Mitigation Expert would presumably testify that he learned that fact from those four potential witnesses themselves.

CONCLUSION

¶90    The district court did not err in its determination that Schoenenberger's confession was voluntary. Schoenenberger has not shown plain error in the court's issuance of its decision on his motion to suppress prior to the filing of an official transcript of the interrogation. The court did not misapply the legal standard when ruling on Schoenenberger's motion for a new trial. Each of Schoenenberger's briefed claims of ineffective assistance of counsel fail, and he has not met his burden under rule 23B of the Utah Rules of Appellate Procedure to merit a remand to develop the factual record in support of additional claims of ineffective assistance of counsel. Therefore, we deny Schoenenberger's motion for a remand under rule 23B and affirm his conviction.

———————